******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# CATHERINE SPINNATO, EXECUTOR (ESTATE OF NANCY A. BRUNO), ET AL. *v.* FRANCINE BOYD ET AL.
## (AC 47071)

Bright, C. J., and Moll and Seeley, Js.*

*Syllabus*

The defendant C, a beneficiary of a trust that consisted primarily of a certain piece of real property and that terminated upon the death of his mother, the decedent, appealed from the trial court's judgment for the plaintiff, individually and in her fiduciary capacities, on the complaint in part and on C's counterclaim. C claimed, inter alia, that the court improperly determined that the trust instrument did not require the sale of the trust property within one year of the decedent's death. *Held*:

The trial court properly interpreted the term "liquidate" in the trust instrument to include actions other than a sale of the trust property, as contemporary dictionary definitions of "liquidate" and the discretion afforded to the plaintiff by the trust instrument and the relevant statute (§ 45a-235) supported the conclusion that the decedent intended to permit the trustees to distribute the interests of the beneficiaries in an alternative manner to a sale of the trust property.

The trial court properly concluded that the trust instrument did not require the plaintiff to sell the trust property within one year of the decedent's death because the discretion afforded to the trustees in the trust instrument demonstrated that the decedent contemplated the possibility that the trustees could distribute the property outside of the one year timeline prescribed in the trust instrument.

The trial court properly rendered judgment for the plaintiff on the breach of fiduciary duty claim in C's counterclaim because, although it found that the plaintiff had engaged in self-dealing and had failed to establish by clear and convincing evidence that such self-dealing was otherwise fair to C, the court also found that the plaintiff was acting in good faith and was therefore shielded from liability pursuant to a provision in the trust instrument.

This court declined to review C's claim that the trial court improperly refused to impute knowledge of the terms of the trust instrument to the plaintiff because the claim was inadequately briefed.

This court found no error in the trial court's adoption of a procedure whereby it would determine in a future proceeding the amount of reasonable expenses

---

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

incurred by the plaintiff in prosecuting the action and defending against the failed counterclaim.

Argued November 18, 2024—officially released March 18, 2025

*Procedural History*

Action to recover damages for, inter alia, breach of fiduciary duty, and for other relief, brought to the Superior Court in the judicial district of New London, where Dennis Goggin et al. were cited in as additional defendants; thereafter, the defendant Charles Bruno filed a counterclaim; subsequently, the complaint was withdrawn as to the named defendant et al.; thereafter, the case was tried to the court, *Jacobs, J.*; judgment in part for the named plaintiff et al. on the complaint and judgment for the named plaintiff et al. on the counterclaim, from which the defendant Charles Bruno appealed to this court. *Affirmed.*

*Mathew Olkin*, for the appellant (defendant Charles Bruno).

*Conrad Ost Seifert*, for the appellee (named plaintiff et al.).

*Opinion*

MOLL, J. The defendant Charles Bruno[1] appeals from the judgment of the trial court, rendered after a bench trial, in favor of the plaintiff Catherine Spinnato[2] on

---

[1] The following additional defendants either were named in the original complaint or were cited into the present action: Francine Boyd, individually and in her capacity as trustee of the Bruno Irrevocable Living Trust; Dennis Goggin, individually and in his capacity as administrator of the estate of Joanne Goggin; and Stephan Goggin. The claims against these defendants were withdrawn on September 20, 2021. In the interest of simplicity, we refer to Charles Bruno as the defendant.

[2] Catherine Spinnato is appearing in the present action in three different capacities, namely, (1) individually, (2) as the executrix of the estate of the decedent, Nancy A. Bruno, and (3) as the trustee of the Bruno Irrevocable Living Trust. For convenience, we refer to Catherine Spinnato as the plaintiff without distinguishing among the various capacities in which she is appearing and use the terms executor and executrix interchangeably.

the plaintiff's request for a declaratory judgment in the operative complaint and on the defendant's operative counterclaim. On appeal, the defendant claims that the court erred in (1) construing the word "liquidate" in the trust instrument to require neither the sale nor the distribution of the trust property within one year of the death of the decedent, Nancy A. Bruno (decedent), (2) ruling against him on one of his claims for breach of fiduciary duty, (3) refusing to impute knowledge of the terms of the trust to the plaintiff, and (4) declining to rule simultaneously on the plaintiff's claim for reimbursement of attorney's fees and, instead, ordering additional proceedings to be held on that issue. For the reasons that follow, we disagree with the defendant's first, second, and fourth claims and deem the defendant's third claim to be abandoned as inadequately briefed. Accordingly, we affirm the judgment of the trial court.

The following procedural history and facts, as set forth by the trial court or undisputed in the record, are relevant to our resolution of this appeal. "[The plaintiff] and [the defendant] are siblings. Together with their sisters, Francine Boyd [(Francine)] and Joanne Goggin [(Joanne)], they were named the beneficiaries of an inter vivos irrevocable trust [(trust)] established in 2006 by their mother, [the decedent], the res of which was the real property owned by [the decedent] and located at 209B Pendleton Hill Road, Stonington . . . [(trust property)]. [The plaintiff, Francine, and Joanne] were named cotrustees."

Part VIII of the trust instrument provides that, "[u]pon the death of the [decedent], all of the [t]rust [p]roperty shall be liquidated and distributed in accordance with [p]art IX below." Part IX of the trust instrument provides: "Upon the death of [the decedent], the [t]rustees shall distribute all of the [t]rust property and accumulated income as follows: [t]hirty percent . . . to [the

plaintiff]; thirty percent . . . to [Joanne], thirty percent . . . to [Francine] and ten percent . . . to [the defendant]. The [t]rustees shall have the sole and absolute discretion as to the manner, timing, transfer, sale, lease or any other use and disposition of the [t]rust [p]roperty so as to accomplish the distributions to the beneficiaries of this [t]rust within one year after the death of [the decedent]." Moreover, part V (H) of the trust instrument provides: "With respect to the exercise or non-exercise of discretionary powers granted by this [d]eclaration of [t]rust, the [t]rustees shall not be liable for actions taken in good faith. Such actions shall be binding on all persons interested in the [t]rust [p]roperty" (section H).

"[The decedent] continued to reside at [the trust property] until April, 2016. So long as she lived there, she covered all of the household expenses out-of-pocket from her own funds. When by April, 2016, her dementia had progressed to the point that she could no longer live independently, she was placed in an assisted living facility in Westerly, Rhode Island, where [the plaintiff] was then living. [The plaintiff] was appointed [as the decedent's] guardian and assumed the responsibility for managing [the decedent's] personal and financial needs. In reviewing [the decedent's] finances to cover the assisted living expense, [the plaintiff] discovered that her sister, Francine, had transferred approximately $110,000 from [the decedent's] savings account into her own account. [The plaintiff's] repeated demands to Francine that she restore the funds to [the decedent's] account were ignored."

"[The decedent] died testate on October 9, 2017. Her will, as amended by codicil, bequeathed her estate to [the plaintiff, Francine, and Joanne] only, in equal shares [per stirpes]." (Footnote omitted.) Joanne predeceased the decedent by one month and was survived by her two sons, Stephan Goggin (Stephan) and Dennis Goggin (Dennis).

"After [the decedent's] death, [the plaintiff] found [the trust property] to be in a state of significant disrepair. She spent months cleaning the [trust property] and making repairs and upgrades." These repairs and upgrades included installing a new water filtration system because the home did not have potable water, making repairs after a tornado damaged the trust property, and replacing the roof in order to comply with a precondition to obtaining homeowners insurance coverage. An accounting prepared by the plaintiff reflected that she spent 446.5 hours repairing and maintaining the trust property.

"After Francine's theft of the funds in [the decedent's] bank account, an account balance of approximately $14,500 remained. Those funds were applied to cover the cost of the repairs and improvements to [the trust property]. Once [the funds were] exhausted, [the plaintiff] covered the cost out of her own pocket. An itemized accounting reflecting expenditures made for [the decedent's] welfare and the upkeep and maintenance, including taxes and utilities, of the [trust property], totaled $97,837.34. To cover these expenditures, [the plaintiff] exhausted the funds—approximately $75,000—in her [personal] 401 (k) account.

"Upon [the decedent's] death, [the plaintiff] retained Attorney Salvatore Ritacco to assist in the administration of [the decedent's] estate and the recovery of the purloined funds. A final guardianship accounting was completed and submitted, and on March 20, 2019, [the plaintiff] was appointed executrix of [the decedent's] estate. Thereafter, [on May 6, 2019], this action was commenced against [Francine, individually and in her capacity as trustee of the trust] for, inter alia, breach of fiduciary duty, constructive trust, and dissolution of the trust. That claim was settled in December, 2020, when [Francine] agreed to resign as cotrustee and transfer her 30 percent stake in the trust to [the plaintiff].

[Joanne] having died in 2017, [the plaintiff] was then the sole trustee of the trust.

"[The plaintiff] believed that she and her sisters had inherited the [trust] property by operation of [the decedent's] will until she was told otherwise by [Ritacco] upon his receipt of the trust instrument in May, 2019. Suffice it to say that she did not know prior to that time that the trust instrument called for the 'liquidation' of the trust res within one year of [the decedent's] death in October, 2017.

"Despite the condition of the [trust property], [the plaintiff] found the property to be a desirable place to live. She found it to be 'very peaceful,' 'the deer . . . running in the woods and the birds . . . chirping.' She 'just started falling in love and really realizing how beautiful it is there.' Having suffered a broken femur, she determined that the house, with the bedroom, bathroom, and kitchen all on one level and an outside ramp, made for easier living than her house in Westerly, Rhode Island, with the bedroom upstairs and the bathroom downstairs. She decided then that [the trust property] is where she wanted to live. Having settled her claim against Francine, she set about acquiring the interests of Stephan and Dennis . . . and [the defendant] in the trust.

"By letter to [the defendant] [in] December 22, 2020, [Ritacco], writing on behalf of [the plaintiff], offered to purchase [the defendant's] [10] percent share in the trust for $10,500, his share of the appraised value of the [trust] property net of the expenses and property taxes paid by [the plaintiff] since the time of [the decedent's] death. In that letter, [Ritacco] wrote that 'a recent appraisal' of the [trust] property had determined the fair market value of that property to be $140,000 and that [the plaintiff] had 'expended over $35,000 of her own monies in order to preserve and maintain the

trust [property] and to pay property taxes, insurance and utilities for the past three years.' A copy of the appraisal report was enclosed; an accounting of the amount paid by [the plaintiff] to cover property taxes, insurance and utilities was not as it was still in the process of being compiled." (Footnote omitted.) The final paragraph of the letter also advised the defendant that there was a pending lawsuit to dissolve the trust and that if a resolution could not be worked out between the plaintiff and the defendant, the defendant may need to be made a party to the lawsuit.

"Once compiled, a copy of the accounting was sent to Stephan and [Dennis]. A copy was not also sent to [the defendant]." Ritacco testified that he " 'would have absolutely provided it to [the defendant] . . . but [the defendant] indicated that he had seen it . . . . [In] subsequent discussions with [the defendant, he] indicated that he had reviewed the expenses with Stephan and Dennis.' [Ritacco] recalled a conversation with [the defendant] that took place in January, 2021, during which the expenses were discussed and [the defendant] expressed his feeling that 'rather than going back and forth that . . . he and his nephews [Stephan and Dennis] should just take the offer, resolve the case, and be done with it all.' According to [Ritacco], [the defendant's] main concern at that time was whether [the plaintiff] had the means to 'make a payment quickly.' "

On March 1, 2021, Ritacco spoke with the defendant by telephone. In that conversation, the defendant "said that the offer, as set forth in [Ritacco's] letter to him [on] December 22, 2020, was acceptable but that his 'big issue' was that the agreement not be contingent on [the plaintiff] having to sell her home in Westerly, Rhode Island. In response, [Ritacco], citing the enormity of the expenses which [the plaintiff] had incurred in keeping up the [trust] property and the attorney's fees and costs which she had incurred as trustee, told him that

[the plaintiff] would 'either need a home equity line or to sell her home to pay out all the beneficiaries.' [Ritacco] added that this was just one of a number of occasions ('most likely in the January and/or the March discussion') on which [the defendant] had indicated that the offer was acceptable and that '. . . [Stephan and Dennis] [should] stop messing around, to just accept the offer and get this done with.'

"[The defendant] remembers things differently. While he may have told [Ritacco] that he would consider the offer, he did not indicate that the offer was acceptable as 'it wasn't clear to [him] as to what else was going on' and that 'he just felt a little bit uneasy as far as trusting what was said to [him].' . . . When he asked [Ritacco] when he would get paid, [Ritacco] had no answer for that—a response that was unacceptable to [the defendant]. . . . That conversation prompted him to hire a lawyer." (Citations omitted.) The subsequent negotiations between the plaintiff and the defendant, through their attorneys, were not successful, and the parties never executed an agreement for the plaintiff to buy out the defendant's interest in the trust property.

On March 3, 2021, the plaintiff filed a motion to cite in the defendant, Stephan, and Dennis, individually and in his capacity as administrator of Joanne's estate, to this action as additional party defendants. The plaintiff argued that "[t]he prospective defendants ha[d] failed to pay their share of the taxes and expenses for the preservation and maintenance of [the trust property]. For nearly three years [the plaintiff] has had to expend over $35,000 for the care of [the decedent] and the trust [property] and will likely expend additional monies to preserve the trust [property]." On March 15, 2021, the court, *Calmar, J.*, granted the plaintiff's motion to cite in the additional party defendants.

"On March 18, 2021, [the plaintiff] listed her Westerly, Rhode Island home for sale. She closed on the sale of

the house on May 20, 2021. Since that time, she has resided at the [trust] property. She has made monthly use and occupancy payments of $1800 into a bank account established by the trust.''

On September 20, 2021, after Stephan and Dennis executed a settlement agreement with her, the plaintiff withdrew her claims against all parties except for the defendant. On April 13, 2023, the plaintiff filed an eight count fourth revised substitute complaint (operative complaint). The first four counts asserted claims of (1) breach of contract, (2) unjust enrichment, (3) fraud and misrepresentation, and (4) breach of the covenant of good faith and fair dealing. In count five, the plaintiff requested that the court provide declaratory relief by determining the parties' rights under the terms of the trust and/or the provisions of the Connecticut Uniform Trust Code, General Statutes § 45a-499a et seq. In count six, the plaintiff requested ''trust remedies and relief under the Connecticut Uniform Trust Code.'' In count seven, the plaintiff sought the court's approval of a final trust accounting and issuance of orders authorizing payment or reimbursement of trust expenses. In count eight, the plaintiff sought termination and/or dissolution of the trust.

On May 19, 2023, the defendant filed an answer to the operative complaint and a nine count amended counterclaim (operative counterclaim). In the first seven counts, the defendant asserted (1) three claims of breach of trust, (2) two counts of breach of fiduciary duty, (3) conversion, and (4) statutory theft pursuant to General Statutes § 52-564. In counts eight and nine, the defendant sought (1) removal of the plaintiff as trustee of the trust or, alternatively, (2) an accounting of the trust. On May 23, 2023, the plaintiff filed an answer and asserted several special defenses to the defendant's operative counterclaim. On June 7, 2023,

the defendant filed a reply to the plaintiff's special defenses.

A bench trial took place on July 11 and 12, 2023. Several witnesses testified, including the plaintiff and the defendant, and several exhibits were admitted into evidence. On October 26, 2023, the court, *Jacobs, J.*, issued a memorandum of decision. The court found in favor of the defendant on the plaintiff's breach of contract claim on the grounds that (1) the defendant had not unequivocally accepted the plaintiff's offer to buy out his interest in the trust property for $10,500, and (2) the plaintiff was "hard-pressed to claim, with a straight face, that she had relied to her detriment on [the defendant's] purported acceptance of the $10,500 offer . . . as she had already determined by that time to make that move [from Rhode Island to Connecticut] . . . ." The court also rendered judgment for the defendant on the plaintiff's claims for unjust enrichment, breach of the covenant of good faith and fair dealing, and misrepresentation. The court found in favor of the plaintiff on the defendant's counterclaim in its entirety. With respect to the defendant's claim that the plaintiff breached her fiduciary duty, the court concluded that, although the plaintiff had engaged in self-dealing as a trustee, she acted in good faith and, therefore, was shielded from liability pursuant to section H of the trust instrument.

The court, in addressing the plaintiff's request for a declaratory judgment regarding the interpretation of part VIII of the trust instrument, agreed with the plaintiff's interpretation of that provision of the trust instrument. Specifically, the court held that the term "liquidation," as used in the trust instrument, did not mandate a *sale* of the trust property, and the plaintiff's failure to sell the property did not amount to a breach of her fiduciary duty. The court noted that the trust instrument reflected the expressed intent of the settlor to conform

the trust instrument with the prescriptions and restrictions of the Connecticut Fiduciary Powers Act, General Statutes § 45a-233 et seq., including General Statutes § 45a-235 (9) and (27),[3] and, in light of the broad discretion afforded to trustees therein, " 'liquidate' cannot, as the defendant has argued, reasonably be interpreted to allow for, let alone mandate, the sale of the [trust] property . . . ." The court also noted that, "if [the decedent], having expressly granted to the trustees all authority and powers conferred on them by Connecticut law, had intended to qualify that grant she would presumably have chosen the word 'sell' . . . instead of 'liquidate' which, according to [Merriam-Webster's Collegiate Dictionary], does not portend a sale." Moreover, in response to the defendant's argument that such a sale must have occurred within one year, the court held that the mention in part IX of a one year timeline was "merely aspirational, its efficacy entirely dependent on the clause which precedes it endowing the trustees with

---

[3] General Statutes § 45a-235 provides in relevant part that "[a]ny one or more or all of the following additional powers or any portion thereof may be incorporated by reference . . . but only to the extent they are individually referred to in such will or other instrument. . . . (9) Residential Realty. To retain any residential real property or apartment and the contents of such real property or apartment received by it hereunder, to purchase, to rent and to maintain residential real property including an ordinary, cooperative or condominium apartment for occupancy, rent free, by any of the beneficiaries hereunder, so long as one or more of them wish to use and occupy it as a home, and to sell it when it is no longer so used and occupied, to pay all rent, taxes, assessments, repairs and other charges for maintaining such real and personal property or apartment, including title, public liability, fire and extended coverage insurance, and to make such purchases or payments out of such beneficiary's portion of the principal or income, in accordance with applicable law, as the fiduciary in its sole discretion shall determine. . . . (27) General Powers. To exercise every power and discretion in the management of the estate and the trusts created hereunder as the fiduciary would have if it were the absolute owner thereof. . . ."

Section 45a-235 was the subject of an amendment in 2019; see Public Acts 2019, No. 19-32, § 10; however, that amendment has no bearing on the merits of this appeal. Accordingly, we refer to the current revision of the statute.

'sole and absolute discretion as to the manner, timing, transfer, sale, lease or any other use and disposition of the trust property.' "

With respect to the value of the defendant's 10 percent interest in the trust property, which both parties disputed, the court found that the plaintiff spent $29,371.19 to maintain the property, that her $20,425 fee as trustee was reasonable, and that, after reimbursing the plaintiff for her expenses, the resulting net value of the trust property was $160,203.81. The defendant was awarded 10 percent of that amount, totaling $16,020.38, "subject to further proceedings to determine the amount of additional expenses reasonably incurred by the [trust] in prosecuting this action and defending against the failed counterclaim . . . ."[4] This appeal followed.[5] Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims on appeal that the trial court erred by rejecting his argument that the trust instrument required (1) a sale of the trust property and (2) the distribution of the trust property within one year of the decedent's death.[6] We disagree.

We begin by setting forth the applicable standard of review and relevant legal principles. "The cardinal rule of construction of all trusts . . . is to find and effectuate the intent of the testator or settlor." *Hartford*

---

[4] In a subsequent articulation, the court further stated that "[t]he amount of the defendant's 10 percent beneficial interest in the trust asset, $16,020.38, is subject to reduction, proportionate to his beneficial interest in the trust asset, for the amount of expenses reasonably incurred by the [plaintiff, as trustee] in prosecuting this action and defending against the failed counterclaim as determined by the court in further proceedings."

[5] On April 25, 2024, the plaintiff filed a motion to dismiss this appeal for lack of a final judgment, which this court denied on May 15, 2024.

[6] The defendant's appellate brief does not specify as to which counts of his operative counterclaim this claim relates.

*National Bank & Trust Co.* v. *VonZiegesar*, 154 Conn. 352, 359, 225 A.2d 811 (1966). "The issue of intent as it relates to the interpretation of a trust instrument . . . is to be determined by examination of the language of the trust instrument itself and not by extrinsic evidence of actual intent. . . . The construction of a trust instrument presents a question of law to be determined in the light of facts that are found by the trial court or are undisputed or indisputable. . . . [W]e cannot rewrite . . . a trust instrument. The expressed intent must control, although this is to be determined from reading the instrument as a whole in the light of the circumstances surrounding the . . . settlor when the instrument was executed, including the condition of [her] estate, [her] relations to [her] family and beneficiaries, and their situation and condition. The construing court will put itself as far as possible in the position of the . . . [settlor] in the effort to construe . . . [any] uncertain language used by [her] in such a way as shall, conformably to the language, give force and effect to [her] intention. . . . But [t]he quest is to determine the meaning of what the . . . [settlor] said and not to speculate upon what [she] meant to say." (Citation omitted; internal quotation marks omitted.) *Spencer* v. *Spencer*, 71 Conn. App. 475, 482, 802 A.2d 215 (2002).

A

In support of his claim, the defendant first contends that the court erred in its interpretation of part VIII of the trust instrument[7] because, in the defendant's view, "[t]he term 'liquidate' is commonly defined to mean 'converted into cash,' i.e., sold." (Emphasis omitted.) We disagree with the defendant because he too narrowly defines "liquidate" and otherwise disregards the

---

[7] As stated previously, part VIII of the trust instrument provides: "Upon the death of the [decedent], all of the [t]rust [p]roperty shall be liquidated and distributed in accordance with [p]art IX below."

discretion afforded to the plaintiff under the trust instrument.

We first must construe the term "liquidate" to determine whether the decedent, as settlor, contemplated any other methods, apart from a sale, to distribute the trust property. At the time when the trust instrument was created, Black's Law Dictionary defined "liquidate" in relevant part as: "1. To settle (an obligation) by payment or other adjustment; to extinguish (a debt). 2. To ascertain the precise amount of (debt, damages, etc.) by litigation or agreement. 3. To determine the liabilities and distribute the assets of (an entity), esp. in bankruptcy or dissolution. 4. To convert (a non-liquid asset) into cash. 5. To wind up the affairs of (a corporation, business, etc.)." Black's Law Dictionary (8th Ed. 2004) p. 949. "Liquidated" was defined as: "1. (Of an amount or debt) settled or determined, esp. by agreement. 2. (Of an asset or assets) converted into cash." Id. "Liquidation" was defined as: "1. The act of determining by agreement or by litigation the exact amount of something (as a debt or damages) that before was uncertain. 2. The act of settling a debt by payment or other satisfaction. 3. The act or process of converting assets into cash, esp. to settle debts." Id., p. 950. Additionally, Merriam-Webster's Collegiate Dictionary (Merriam-Webster) contemporaneously defined "liquidate" in relevant part as: "to determine by agreement or by litigation the precise amount of (indebtedness, damages, or accounts)"; "to determine the liabilities and apportion assets toward discharging the indebtedness of"; "to settle (a debt) by payment or other settlement"; "to make clear"; "to do away with"; "to convert (assets) into cash"; "to liquidate debts, damages, or accounts"; and "to determine liabilities and apportion assets toward discharging indebtedness." Merriam-Webster's Collegiate Dictionary (11th Ed. 2003) p. 726.

On the basis of the foregoing definitions, we do not agree with the defendant's argument that part VIII's inclusion of the words "liquidated and distributed" reflects an intent by the decedent that the trust property be sold, nor do we agree with the defendant that "[s]uch distribution would be virtually impossible absent a sale." (Emphasis omitted.) Although the defendant is correct that Merriam-Webster's definition of "liquidate" includes the possibility of a sale; Merriam-Webster's Collegiate Dictionary, supra, p. 726; the contemporaneous definitions of "liquidate" also include other manners of distribution. Specifically, one other method that appears in multiple definitions is "[t]o settle (an obligation) by payment"; Black's Law Dictionary, supra, p. 949; or, in slightly different words, "settling a debt by payment or other satisfaction." Id., p. 950. Thus, paying out the interest of another individual, which was the plaintiff's intended approach in the present case, falls within the definition of "liquidate," as that term is used in the trust instrument.

Moreover, the defendant's argument that a sale was the sole means by which the plaintiff could distribute the trust property ignores the fact that the trust instrument gives the trustee broad discretion as to the manner of the distribution. As was previously iterated, part IX of the trust instrument provides in relevant part that "[t]he [t]rustees shall have the sole and absolute discretion as to the *manner*, timing, transfer, sale, lease *or any other use and disposition of the* [t]rust [p]roperty so as to accomplish the distributions to the beneficiaries of this [t]rust within one year after the death of [the decedent]." (Emphasis added.)

This conclusion is further bolstered by the fact that the trust instrument was explicitly intended to conform with Connecticut law, which, as noted by the court, includes "the prescriptions and restrictions of [§ 45a-235] . . . ." Section 45a-235 (9) empowers a fiduciary

"[t]o retain any residential real property or apartment and the contents of such real property or apartment received by it hereunder, to purchase, to rent and to maintain residential real property including an ordinary, cooperative or condominium apartment for occupancy, rent free, by any of the beneficiaries hereunder, so long as one or more of them wish to use and occupy it as a home, and to sell it when it is no longer so used and occupied . . . ." It is not conceivable that the trust instrument would require the trustee to sell the property to comply with the liquidation requirement while simultaneously empowering the trustee to have broad discretion to determine the manner of distribution and/or retain the trust property for occupancy as a home.

Thus, the definitions of the term "liquidate," as well as the discretion afforded to the plaintiff by both the trust instrument itself and § 45a-235, support the conclusion that the decedent intended to permit the trustee(s) to distribute the interests of the beneficiaries in an alternative manner to a sale. Accordingly, we conclude that the court properly interpreted that term in the trust instrument.

B

The defendant next argues that the court improperly determined that the trust instrument did not require the sale of the trust property within one year of the decedent's death. The defendant maintains that a sale was required to have occurred within one year of the decedent's death because, in his view, part IX of the trust instrument directs the trustees to accomplish the distribution of the trust property to the beneficiaries within that period. We disagree with the defendant's argument because it ignores the discretion afforded to the plaintiff in part IX of the trust instrument.[8]

---

[8] The plaintiff argues that this portion of the defendant's claim is inadequately briefed. See *Robb* v. *Connecticut Board of Veterinary Medicine*, 204 Conn. App. 595, 611, 254 A.3d 915, cert. denied, 338 Conn. 911, 259 A.3d

We again emphasize that part IX of the trust instrument empowers the trustees with "the sole and absolute discretion as to the . . . timing . . . of [the distribution of] the [t]rust [p]roperty so as to accomplish the distributions to the beneficiaries of this [t]rust within one year after the death of [the decedent]." The court correctly noted that, although part IX "contemplates the disposition of the [trust] property within one year of [the decedent's] death . . . [such] language [is] merely aspirational, its efficacy entirely dependent on the clause which precedes it endowing the trustees with 'sole and absolute discretion as to the manner, *timing*, transfer, sale, lease or any other use and disposition of the [t]rust [p]roperty.' " (Emphasis added.) We agree with the court's conclusion that the discretion afforded to the trustee(s) in the trust instrument demonstrates that the settlor contemplated the possibility that the trustee(s) could distribute the trust property outside of the one year timeline prescribed in part IX.[9]

In sum, the court properly concluded that the trust instrument did not require the plaintiff to sell the trust property within one year of the decedent's death.

654 (2021). We conclude, however, that the defendant's claim is adequately briefed and, therefore, address its merits.

[9] Even if we were to accept the defendant's argument that the one year timeline was a mandate, the plaintiff would still be shielded from liability for her failure to distribute the trust property within one year. As noted earlier in this opinion, section H of the trust instrument provides in relevant part: "With respect to the exercise or non-exercise of discretionary powers granted by this [d]eclaration of [t]rust, the [t]rustees shall not be liable for actions taken in good faith." The court found that "the [plaintiff's] delay in disposing of the trust property resulted not from neglect or bad faith on the part of [the plaintiff] but from the priority given to addressing [Francine's] theft of funds from [the decedent's] estate and [the plaintiff's] belated discovery that the [trust] property had been placed in [the] trust and was thus not an asset of [the decedent's] estate." That finding is not clearly erroneous. See *C. D.* v. *C. D.*, 218 Conn. App. 818, 824, 293 A.3d 86 (2023) ("[a] finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (internal quotation marks omitted)). Thus,

## II

The defendant next claims that the trial court erred in ruling against him on his breach of fiduciary duty claim as alleged in the fourth count of the operative counterclaim. We disagree.

The following legal principles and standard of review govern our resolution of this claim. "A trustee owes a fiduciary duty to administer the trust in the interest of the beneficiaries, and that duty commences when the trustee accepts the trusteeship. . . . The trustee's administration of the trust must comport with her duties of loyalty and prudence." (Citations omitted.) *Barash* v. *Lembo*, 348 Conn. 264, 285, 303 A.3d 577 (2023). "[I]n order to allege a claim against a trustee for breach of fiduciary duty, a plaintiff must allege (1) the existence of a fiduciary relationship, giving rise to a duty, (2) breach of that duty, (3) causation, and (4) damages." Id., 302–303. A breach of fiduciary duty claim presents a mixed question of law and fact. "Accordingly, we review the court's factual findings for clear error and conduct a plenary review of the court's ultimate conclusion as to whether the plaintiff proved that [she] did not breach [her] fiduciary duty to the defendant." *ASPIC, LLC* v. *Poitier*, 208 Conn. App. 731, 743, 267 A.3d 197 (2021). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . .

"In determining whether the court's decision was clearly erroneous, we must examine the court's decision in the context of the heightened standard of proof

the plaintiff, acting in good faith, may not be held liable for her failure to distribute the trust property within one year of the decedent's death.

imposed on a fiduciary. . . . Once a fiduciary relationship is found to exist, the burden of proving fair dealing properly shifts to the fiduciary. . . . Furthermore, the standard of proof for establishing fair dealing is not the ordinary standard of proof of fair preponderance of the evidence, but requires proof either by clear and convincing evidence, clear and satisfactory evidence or clear, convincing and unequivocal evidence." (Citations omitted; internal quotation marks omitted.) *Spector* v. *Konover*, 57 Conn. App. 121, 126–27, 747 A.2d 39, cert. denied, 254 Conn. 913, 759 A.2d 507 (2000). "The construction of a trust instrument presents a question of law to be determined in the light of facts that are found by the trial court or are undisputed or indisputable." (Internal quotation marks omitted.) *Taylor* v. *Taylor*, 117 Conn. App. 229, 235, 978 A.2d 538, cert. denied, 294 Conn. 915, 983 A.2d 852 (2009).

The fourth count of the defendant's operative counterclaim alleged in relevant part that the plaintiff breached her fiduciary duty by (1) failing to timely liquidate and distribute the trust property as required by the trust instrument, (2) "[seeking] to have the value of the beneficiaries' distributive shares determined by judicial decree rather than by liquidation of the trust property on the open market as required by the [trust instrument]," (3) "[seeking] to have the trust property conveyed to herself by judicial decree rather than sold on the open market as provided in the [trust instrument]," and (4) committing such acts with "reckless indifference to the rights of [the defendant] or in intentional and wanton violation of his rights." The court rendered judgment in favor of the plaintiff on this claim. Specifically, the court stated that (1) the plaintiff had engaged in self-dealing, which she had failed to establish by clear and convincing evidence as having been "otherwise fair to [the defendant]," but (2) it "[did] not find [that] the plaintiff's self-dealing, while perhaps ill-advised, was

either odious or motivated by ill will" and that "self-dealing was within her discretion under the broad terms of the trust instrument . . . ." Moreover, the court found that, despite the plaintiff's delay in liquidating the trust property, she "was acting in good faith and, thus, shielded from liability under [section H]."

The defendant's argument on appeal, in essence, is that the court's findings that the plaintiff (1) was self-dealing by moving into the trust property and maintaining the home and (2) "failed to prove by clear and convincing evidence that her self-dealing was otherwise fair to [the defendant]" required the court to render judgment in his favor on his breach of fiduciary duty claim. We disagree.

The defendant's argument is unavailing because it ignores the critical determination made by the court that the plaintiff "was acting in good faith and, thus, shielded from liability under [section H]." Although the court found that the plaintiff had engaged in self-dealing and that she failed to prove that her self-dealing was otherwise fair to the defendant, the court "credit[ed] the testimony of [the plaintiff] and [Ritacco]" and "[found], by clear and convincing evidence, that the delay in disposing of the trust property resulted not from neglect or bad faith on the part of [the plaintiff] but from the priority given to addressing [Francine's] theft of funds from [the decedent's] estate . . . ." The court iterated its conclusion, stating that "the plaintiff has proven, by clear and convincing evidence, that [she] has exercised her duties as trustee of the [trust] in good faith and in accordance with the terms and purposes of the trust, the [decedent's] intent, and the interests of the beneficiaries—of which she is one—and that she has not engaged in shameless self-dealing . . . ." The defendant does not dispute these findings on appeal.[10]

[10] In a footnote of his appellate brief, the defendant states that the court's determination "that the plaintiff had exercised her duties as trustee 'in good faith and in accordance with the terms and purposes of the trust' is arguably

Accordingly, pursuant to section H, the plaintiff was shielded from liability for breach of a fiduciary duty.

In sum, we conclude that the court correctly found that the plaintiff did not breach her fiduciary duty and, therefore, properly rendered judgment for the plaintiff on the defendant's breach of fiduciary duty claim.

## III

The defendant next claims that the trial court improperly refused to impute knowledge of the terms of the trust instrument to the plaintiff. In connection with this claim, the defendant asserts that ignorance of the trust's terms is not a defense for the delay in liquidating the trust property because "[a] reasonable person would inform themselves of the terms of a trust which they had executed; and to which they had transferred property; and of which they had agreed to serve as a fiduciary." The plaintiff argues that the defendant's claim is inadequately briefed. We agree with the plaintiff.

"We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [F]or this court judiciously and

---

inconsistent but ultimately inapposite. The plaintiff's specific burden under [*Konover Development Corp.* v. *Zeller*, 228 Conn. 206, 219, 635 A.2d 798 (1994)] was to prove fair dealing, a concept distinct from good faith or fulfillment of the trust's terms." (Emphasis omitted.) We disagree with the defendant. The critical difference between the present case and the circumstances in *Konover Development Corp.* is the existence of section H in the trust instrument. We interpret section H to provide protection for the plaintiff for actions done in good faith, regardless of whether the plaintiff proved fair dealing pursuant to *Konover Development Corp.* Thus, although *Konover Development Corp.* describes the default burden of proof imposed on the fiduciary, the trust instrument added an additional protection for the plaintiff.

efficiently to consider claims of error raised on appeal
. . . the parties must clearly and fully set forth their
arguments in their briefs. . . . The parties may not
merely cite a legal principle without analyzing the rela-
tionship between the facts of the case and the law
cited." (Internal quotation marks omitted.) *Robb* v. *Con-
necticut Board of Veterinary Medicine*, 204 Conn. App.
595, 611, 254 A.3d 915, cert. denied, 338 Conn. 911, 259
A.3d 654 (2021); see also *Lewis* v. *Commissioner of
Correction*, 211 Conn. App. 77, 99–100, 271 A.3d 1058
(concluding that petitioner inadequately briefed claims
because he "failed to provide any legal analysis as to
how the court erred with respect to [his] claims"), cert.
denied, 343 Conn. 924, 275 A.3d 1213, cert. denied sub
nom. *Lewis* v. *Quiros*,      U.S.     , 143 S. Ct. 335, 214
L. Ed. 2d 150 (2022).

In part III of the defendant's appellate brief, spanning
fewer than two pages, the defendant makes no attempt
to explain how, even if the plaintiff were deemed to
have known of the terms of the trust at the time of its
execution, the court erred in rendering its judgment
and, therefore, has not provided the type of legal analy-
sis necessary for us to review this claim. Accordingly,
we deem this claim to be abandoned as inadequately
briefed.[11]

IV

Finally, the defendant cursorily claims that the trial
court, upon concluding that the record was insufficient
to enable it to assess the reasonableness of the plain-
tiff's request for attorney's fees, should have simply

---

[11] Even if we were to address the defendant's third claim on the merits,
however, it would still fail for the reasons explained in part II of this opinion,
namely, that the good faith provision in section H shields the plaintiff from
liability for actions taken in good faith.

denied the plaintiff's request, instead of ordering additional proceedings to be held on that issue. We disagree.

By way of brief review, the plaintiff claimed to have incurred attorney's fees totaling $88,509.81 in the defense or administration of the trust, i.e., $44,988.13 of which was paid to the Law Office of Salvatore Ritacco, LLC, and $43,521.68 of which was paid or payable to the Law Office of Gerald Del Piano, LLC. Affidavits of Attorneys Ritacco and Gerald A. Del Piano, as well as detailed bills, were in evidence. In its memorandum of decision, the court acknowledged the foregoing evidence but ordered additional proceedings to determine, pursuant to rule 1.5 of the Rules of Professional Conduct, its commentary, and the twelve factor test set forth in *Johnson* v. *Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), the amount of expenses the plaintiff reasonably incurred in prosecuting the action and defending against the failed counterclaim. In doing so, the court stated that it was "mindful of the fact that (1) it was [the plaintiff's] fiduciary duty to bring an action to dissolve the trust; (2) given the inability of the parties to agree on an amount representing the value of the defendant's 10 percent beneficial interest in the trust, the plaintiff had no choice but to seek a declaratory judgment determining that value; (3) even if, arguendo, there had been an agreement, the agreement would have been subject to court approval; and (4) while the plaintiff's claims for breach of contract, unjust enrichment, breach of the covenant of good faith and fair dealing, and misrepresentation failed, the plaintiff successfully defended the claims made by the defendant in his counterclaim."

We find no error in the court's adopting a procedure whereby, against the backdrop of its liability findings at trial, it would determine in a future proceeding the

amount of reasonable expenses incurred by the plaintiff in prosecuting the action and defending against the failed counterclaim.[12]

The judgment is affirmed.

In this opinion the other judges concurred.

---

[12] We further note that it is implicit, in the context of our final judgment jurisprudence, that a trial court does not err when it puts off for another day the determination of the amount of attorney's fees to be awarded. That is, our appellate courts repeatedly have applied the bright-line rule that "a judgment on the merits is final for purposes of appeal even though the recoverability or amount of attorney's fees for the litigation remains to be determined." *Paranteau* v. *DeVita*, 208 Conn. 515, 523, 544 A.2d 634 (1988); see also *Ledyard* v. *WMS Gaming, Inc.*, 330 Conn. 75, 90–91, 191 A.3d 983 (2018) (reversing dismissal of defendant's appeal from decision of trial court, which had ordered that plaintiff town was entitled to recover certain attorney's fees but had not yet determined amount of those fees when defendant appealed); *Hylton* v. *Gunter*, 313 Conn. 472, 487, 97 A.3d 970 (2014) (reversing dismissal of appeal and concluding that appealable final judgment existed when all that remained for trial court to do was to determine amount of attorney's fees comprising common-law punitive damages that it previously had awarded). To conclude that the court in the present action erred in essentially adopting a bifurcated procedure would conflict with this jurisprudence.

We also fail to see how the defendant is harmed by the court's decision to permit him to challenge in a later proceeding the affidavits submitted in support of the plaintiff's application for attorney's fees. Furthermore, the defendant can appeal from any final determination the court makes after giving him a full opportunity to challenge the plaintiff's requested fees.