******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STEPHANIE NETTER *v.* DONALD NETTER
## (AC 46484)

Alvord, Suarez and Bear, Js.

*Syllabus*

The defendant appealed from the trial court's judgment dissolving his marriage to the plaintiff and granting certain other relief. He claimed, inter alia, that the court improperly treated certain trust assets as part of the marital estate subject to distribution pursuant to statute (§ 46b-81). *Held*:

The trial court's finding that a spendthrift trust created by the defendant's father prior to the parties' marriage was part of the marital estate and subject to distribution pursuant to § 46b-81 was clearly erroneous, as the trust agreement provided that all trust distributions to the defendant had to be approved by a disinterested trustee, and, accordingly, the defendant had no presently enforceable right to receive his interest in the trust and the court should not have considered it an asset of the marital estate that it was authorized to divide pursuant to § 46b-81.

The trial court properly determined that three trusts created by the defendant during the parties' marriage and funded with marital assets constituted divisible marital property, as, although the trusts were created as self-settled spendthrift trusts under South Dakota law, at the time the trusts were created Connecticut did not recognize the validity of self-settled trusts and, even if the trusts had satisfied the requirements of the Connecticut Qualified Dispositions in Trust Act (§ 45a-487j et seq.), enacted in 2019, they would nonetheless be void as a matter of public policy by virtue of the fact that sustaining them and excluding their assets from distribution would unfairly prejudice the plaintiff.

This court, having concluded that the trial court improperly treated the assets from one of the trusts as marital property, determined that, on remand, the entirety of the mosaic of financial orders, excluding the personal property distribution order, must be refashioned, as it was uncertain whether the trial court's other financial orders would remain intact after reconsidering the property distribution orders in a manner consistent with this court's opinion.

The trial court did not abuse its discretion in awarding sole legal custody of the parties' minor children to the plaintiff, as the court's findings, which were either unchallenged or based on its credibility determinations and which were consistent with the testimony and recommendations of the guardian ad litem, supported the award of sole legal custody to the plaintiff.

The trial court did not abuse its discretion with respect to its order that the plaintiff have access to the former marital residence to retrieve her

personal belongings, as the order was sufficiently clear and explicit and was appropriately tailored to the facts and circumstances of this case.

Argued March 18—officially released October 21, 2025

*Procedural History*

Action for the dissolution of a marriage, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk and tried to the court, *Heller, J.*; judgment dissolving the marriage and granting certain other relief, from which the defendant appealed to this court. *Appeal dismissed in part; reversed in part; new trial.*

*Kevin F. Collins*, for the appellant (defendant).

*James P. Sexton*, with whom were *Aidan R. Welsh* and *John R. Weikart*, for the appellee (plaintiff).

*Opinion*

BEAR, J. The defendant, Donald Netter, appeals from the judgment of the trial court dissolving his marriage to the plaintiff, Stephanie Netter, and from certain financial orders, an order awarding the plaintiff sole legal custody of the parties' two children, who were both then minors, and an order permitting the plaintiff access to the marital residence in order to retrieve her personal belongings.[1] On appeal, the defendant claims that the court improperly (1) treated trust assets from four separate trusts as marital property under General Statutes

---

[1] The trial court previously had issued a nearly identical pendente lite access order, in a June 9, 2021 memorandum of decision, from which the defendant appealed. See *Netter* v. *Netter*, 220 Conn. App. 491, 493, 298 A.3d 653 (2023). While that appeal was pending, the court issued its memorandum of decision dissolving the parties' marriage. Id., 497. This court thereafter dismissed as moot the portion of that appeal that challenged the pendente lite access order upon concluding "that there is no practical relief that we may afford the defendant as to the pendente lite access order because it was superseded by the access order contained within the final dissolution judgment." Id., 498.

§ 46b-81[2] and ordered the defendant to make a lump sum property distribution to the plaintiff using funds from those trusts, (2) calculated his earning capacity and relied on that "astronomical" calculation to set "unachievable child support and alimony orders," (3) ordered the defendant to secure and maintain a $5,000,000 life insurance policy, (4) ordered the defendant to pay $3,300,000 in attorney's fees to the plaintiff, (5) valued the assets within the marital estate, including, but not limited to, the trust assets, (6) faulted him for the breakdown of the marriage and awarded the plaintiff sole legal custody of the parties' two, then minor, children, and (7) issued a vague and imprecise order that allows the plaintiff unrestricted access to the parties' former marital residence in order to retrieve her personal property in violation of his constitutional rights. Because we conclude that the court improperly determined that trust assets from one of the four trusts—i.e., the spendthrift trust the defendant's father created for the defendant's benefit, prior to the marriage—constituted divisible marital property, and ordered the defendant to make

---

[2] General Statutes § 46b-81 provides: "Assignment of property and transfer of title. (a) At the time of entering a decree annulling or dissolving a marriage or for legal separation pursuant to a complaint under section 46b-45, the Superior Court may assign to either spouse all or any part of the estate of the other spouse. The court may pass title to real property to either party or to a third person or may order the sale of such real property, without any act by either spouse, when in the judgment of the court it is the proper mode to carry the decree into effect.

"(b) A conveyance made pursuant to the decree shall vest title in the purchaser, and shall bind all persons entitled to life estates and remainder interests in the same manner as a sale ordered by the court pursuant to the provisions of section 52-500. When the decree is recorded on the land records in the town where the real property is situated, it shall effect the transfer of the title of such real property as if it were a deed of the party or parties.

"(c) In fixing the nature and value of the property, if any, to be assigned, the court, after considering all the evidence presented by each party, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income.

distributions to the plaintiff from that trust, we reverse the judgment of the trial court with respect to all the financial orders and remand this case for a new trial on all financial issues consistent with this opinion, with the exception of the personal property distribution order that gives rise to the property access order. We affirm the judgment of the court as to the custody order insofar as it pertains to the parties' remaining minor child and as to the property access order.[3]

The following facts and procedural history are relevant to our resolution of the present appeal. The parties were married on July 9, 2005, in New York, New York. The parties have two daughters; the first was born in October, 2006, and the second was born in May, 2009.[4] On March 1, 2017, the plaintiff commenced this action seeking the dissolution of her marriage to the defendant, alleging that it had broken down irretrievably and seeking, inter alia, joint legal custody of the parties' two then minor children. On May 25, 2017, the defendant filed an answer and cross complaint in which he sought, inter alia, sole legal custody of the children. The plaintiff then amended her complaint on February 2, 2018, to seek sole legal custody of the children.

The proceedings in this matter have been highly contentious and protracted. The trial itself took place on fifty-seven nonconsecutive days, over the course of seventeen months, between May 5, 2021, and September

The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates."

[3] Because we remand the matter for a new trial on all financial orders, we need not reach the defendant's claims that the court improperly (1) calculated his earning capacity and relied on that "astronomical" calculation to set "unachievable child support and alimony orders," (2) ordered the defendant to secure and maintain a $5,000,000 life insurance policy, (3) ordered the defendant to pay $3,300,000 in attorney's fees to the plaintiff, and (4) valued the assets within the marital estate, including, but not limited to, the trust assets.

[4] Although both children were minors at the time of judgment in this case, the parties' older daughter has since reached the age of majority.

12, 2022.[5] Many pendente lite motions were filed, and the resolution of two such motions gave rise to a prior appeal by the defendant to this court. See *Netter* v. *Netter*, 220 Conn. App. 491, 493, 298 A.3d 653 (2023). On January 23, 2023, while that appeal was pending, the trial court, *Heller*, *J.*, rendered judgment dissolving the parties' marriage. See footnote 1 of this opinion. In its memorandum of decision, the court found that "[t]he plaintiff is fifty-five years old. She attended Syracuse University and graduated in 1990 from New York University. After she graduated from New York University, she took some classes locally from Ramapo College.

"The plaintiff received a master's degree in physical therapy in 1998 from the Institute for Physical Therapy, which is now part of the University of St. Augustine for Health Sciences. She worked in Mississippi and Alabama as a contract physical therapist after graduation.

"The plaintiff became a licensed physical therapist in New Jersey. She worked as a physical therapist at the Kessler Institute for Rehabilitation and at Twin Boro Physical Therapy. She was working at Twin Boro when she and the defendant were married in July, 2005. Her annual income was approximately $65,000 in 2005, when she last worked outside of the home.

"The plaintiff is in good health. . . .

"The defendant is sixty-one years old. He is in good health. He received a bachelor of science degree in economics from the Wharton School of the University of Pennsylvania in 1983.

---

[5] The defendant represented himself at trial and the court found that his "litigation and discovery misconduct contributed to the case taking more than four years to come to trial and the trial itself lasting" as long as it did. Sixteen witnesses testified at the trial, including the plaintiff, the defendant and the plaintiff's expert, Elizabeth Ciccone, who specialized primarily in business valuation and forensic accounting with Marcum, LLP, and both parties introduced exhibits that were admitted into evidence.

"The defendant has over thirty years of professional investment experience, according to his curriculum vitae, or CV. He has served on the boards of four public companies. As described in his CV, the defendant was a founder of Dolphin Limited Partnerships. He served as a senior managing director of Dolphin Holdings Corp., a co-senior managing director of Dolphin Holdings Corp. II, and senior managing director of Dolphin Holdings Corp. III, all entities under the Dolphin umbrella. The three Dolphin limited partnerships—Dolphin Limited Partnership, LP (DLP I), Dolphin Domestic Fund II, LP, and Dolphin Master Fund II, LP (collectively, DLP II), and Dolphin Limited Partnership III, LP—and Dolphin Financial Partners, LLC (DFP), were described as sizable investors in over twenty public companies on the defendant's CV.

"The defendant was employed by Geneve Corporation (Geneve) at the time of the marriage. Geneve is a subsidiary of Geneve Holdings, Inc. (Geneve Holdings), a private financial holding company controlled by his family. Geneve Holdings' assets are comprised primarily of insurance companies. The defendant's father, Edward Netter, was the head of Geneve. The defendant earned compensation of approximately $50,000 in 2005 from Geneve. The defendant also managed the various Dolphin entities from his Geneve office.

"Edward Netter died from cancer on February 16, 2011. The defendant's mother, Barbara Netter, became the majority shareholder of Geneve Holdings. The defendant's relationship with Geneve deteriorated. In early 2013, he was either terminated or he resigned from his position with Geneve. He relocated the business operations of the Dolphin entities to the marital residence, located at 623 Round Hill Road, Greenwich, Connecticut (the Round Hill Road property). The defendant has managed his business interests from the pool house

at the Round Hill Road property since that time." (Footnotes omitted.)

The court explained that "[t]he parties enjoyed an affluent lifestyle during the marriage" and further indicated that "[t]he defendant brought significant assets to the marriage." The court noted, among other things, that "[t]he defendant was the primary beneficiary and trustee of The Donald Netter Family Trust." Regarding the defendant's income, the court found that his "financial affidavit reflects net monthly income of $3599" and, "[c]onsidering the defendant's years of experience in finance and as a fund manager, his professional credentials, and his prior earnings, [determined] that the defendant has a present earning capacity of at least $2,500,000 annually." Moreover, the court found that the "defendant controls assets worth in excess of $175,000,000."

The court determined that the defendant was responsible for the breakdown of the marriage. It deemed the plaintiff's testimony credible and explained that she "testified that there were six main reasons for the breakdown of the marriage: the defendant's paranoia and suspicious behavior; his controlling and abusive conduct; his sexually coercive behavior; his inability to get along with others; his conviction that [the plaintiff] was anorexic; and his gaslighting her and telling her she was crazy." Among other things, "[t]he defendant constantly accused the plaintiff of being after his money." He "would not provide information to the plaintiff regarding their finances. He refused to discuss any financial matters with her. Without the plaintiff's knowledge, the defendant transferred most of the marital assets into irrevocable South Dakota trusts . . . ."

To this end, the court stated that the defendant had "identifie[d] four South Dakota trusts as assets on his financial affidavit: The Six Cataracts Trust, The DASSA

Trust, The Scout Resources Trust, and The Ann Holdings Trust" and it made certain findings pertaining to each one. (Footnote omitted.) The court explained that, "[o]*ther than The Six Cataracts Trust*, the trusts are self-settled trusts,[6] formed by the defendant after the date of the marriage with marital assets." (Emphasis added; footnote added.)

The court further explained that "The Six Cataracts Trust, formerly The Donald Netter Family Trust,[7] was

---

[6] "Under Connecticut law, a trust is self-settled if a settlor places his or her assets into trust for his or her own benefit." *Ferri* v. *Powell-Ferri*, 326 Conn. 438, 456, 165 A.3d 1137 (2017).

[7] The Donald Netter Family Trust Agreement was admitted into evidence, as plaintiff's exhibit 473, during Elizabeth Ciccone's direct testimony at trial. See footnote 5 of this opinion. Although the defendant did not object to its admission into evidence, he did request, immediately after it was admitted, that it "be filed under seal." The plaintiff's counsel voiced no objection to the defendant's request, and the court issued an order dated November 4, 2021, sealing plaintiff's exhibit 473.

We note that the defendant did also file thereafter, at the court's request, a motion to seal "certain business records" and that motion had been posted in the Superior Court clerk's office in order to give the public notice of the sealing request. Several months later, following numerous requests by the court and in response to the final deadline the court imposed, the defendant filed a more specific list of the documents he sought to have sealed. The court had explained, when setting that deadline, that it was "certainly open to sealing specific documents. I do take the view that confidential business information, particularly, in the nature of trade secrets or other confidential information that would be harmful to the party if it were disclosed because it could have business and financial consequences, I will seal that.

"But I need to know what it is and I need to know why you want it sealed because I need to make a finding that the individual interest and maintaining the confidence of that information outweighs any public . . . interest [in] having that information disclosed.

"We've never had that hearing because you've never told me which specific documents in the record you wish to have sealed." Although we cannot ascertain, on the basis of the record before us, whether that hearing ultimately took place, we are satisfied, nonetheless, with the court's compliance with the procedures set forth in Practice Book § 25-59A, which governs the sealing of documents in family matters. Moreover, our review of the record does not reveal that plaintiff's exhibit 473 was unsealed and, thus, we are bound by the sealing order for purposes of our review of the claims on appeal. See Practice Book §§ 77-2 and 77-4. We are therefore limited in this respect to the findings the court made as to the terms of The Donald Netter

*created by Edward Netter in 1992 for the benefit of the defendant and his descendants.* The defendant was named the Family Trustee of The Donald Netter Family Trust.

"Under The Donald Netter Family Trust Agreement, *the trustees, other than the defendant, have the power to pay or apply so much of the net income of the trust or the principal of the trust fund to or for the use of the defendant and his issue as they in their sole discretion determine to be advisable* for the comfort, support and maintenance of the defendant and his issue.

"The defendant, as the Family Trustee, has the power to appoint additional trustees, to designate successor trustees, and to revoke the designation of any successor trustee. The defendant also has the power to remove any acting trustee, provided that he may not exercise such power more than three times in any ten year period and that at least one half of the trustees shall be disinterested trustees immediately after he has exercised such power. The defendant exercised this power on March 18, 2013, when he appointed the South Dakota Trust Company, LLC (South Dakota Trust), as Disinterested Trustee, as defined in the trust agreement.

"The defendant and South Dakota Trust created a new entity, SDAS, LLC,[8] *into which all of the assets of*

Family Trust Agreement. Neither party has challenged as part of this appeal the court's findings in these respects, or the propriety of the court's having made them. See *JPMorgan Chase Bank, National Assn.* v. *Essaghof,* 221 Conn. App. 475, 485, 302 A.3d 339 ("claims of error not briefed are considered abandoned" (internal quotation marks omitted)), cert. denied, 348 Conn. 923, 304 A.3d 445 (2023).

[8] The record reflects that the defendant appointed South Dakota Trust as a Disinterested Trustee of The Donald Netter Family Trust on March 15, 2013, and that South Dakota Trust accepted the appointment on March 18, 2013. The defendant and South Dakota Trust also executed, on March 15 and 18, 2013, respectively, "The Donald Netter Family Trust Resolution by Trustees to Form LLC and Fund LLC with All Trust Assets" (trust resolution). The trust resolution authorized (1) "[t]he formation of SDAS, LLC in the State of South Dakota"; (2) "[t]he transfer of all assets in the name of the Trust to SDAS, LLC"; (3) "[the appointment of the defendant] as the Initial

*The Donald Netter Family Trust were transferred.* The Donald Netter Family Trust was renamed The Six Cataracts Trust on May 13, 2018.

"The Six Cataracts Trust owns SDAS, LLC. The defendant is the sole manager of SDAS, LLC. He is also the Investment Trust Advisor of The [Six Cataracts] Trust. [The plaintiff's expert] Marcum [LLP (Marcum)] reported that, based on its review of documents produced by or on behalf of the defendant in discovery, the defendant is the sole signatory for SDAS, LLC, when making investments. As manager of SDAS, LLC, the defendant can unilaterally vote the shares of Geneve Holdings that The Six Cataracts Trust holds through its ownership of SDAS, LLC.

"Marcum determined that The Six Cataracts Trust, through its ownership of SDAS, LLC, held assets with a total fair market value of $122,678,483, comprised of two brokerage accounts and investments in Trefoil, Hawkes Bay, Geneve Holdings, and The Ann Holdings, LLC, as of the valuation dates.[9]" (Emphasis added; footnotes added; footnote in original; footnotes omitted.)

Investment Trust Advisor . . . of the Trust to be the Manager of SDAS, LLC" and (4) "[the defendant, as] Manager of SDAS, LLC and as the Initial Investment Trust Advisor . . . to take any and all necessary actions to change title of Trust assets to SDAS, LLC and to retain the Trust's taxpayer identification number in the name of SDAS, LLC treated as a disregarded entity for income tax purposes." The plaintiff's expert, Elizabeth Ciccone; see footnote 5 of this opinion; testified that the trust resolution, among other things, gave "South Dakota, as opposed to Connecticut, control over the LLC and the trust itself." The court credited "Ciccone's testimony over twelve days of trial and the two Marcum expert reports, including the exhibits to the reports, that were admitted into evidence: the Marcum Valuation Report of [the defendant's] Closely Held Business Interests (the Marcum Business Interests Valuation Report) and the Marcum report of the Value of the Underlying Assets Held by Trusts for the Benefit of [the defendant] (the Marcum Trusts Assets Valuation Report)." (Footnote omitted.)

[9] "Marcum detailed the following holdings of The Six Cataracts Trust through its ownership of SDAS, LLC, with a total value of $122,678,483: Merrill Lynch #621 Brokerage, $1,067,685; UBS #8E Brokerage, $22,277,587; 0.70 percent interest in Trefoil-Garnet Capital Partners, LP, $1,095,557; 0.17 percent interest in Hawkes Bay Partners, LP, $991,380; 19 percent interest

The court described the other three trusts, The DASSA Trust, The Scout Resources Trust and The Ann Holdings Trust, as "self-settled trusts that the defendant formed during the marriage with marital assets and without the plaintiff's knowledge." The defendant "secretly created" these three trusts, the court found, "as the marriage deteriorated." The court further explained that the terms of the self-settled trust agreements were "substantially similar" to each other. Among other things, the defendant is the investment trust advisor to and the sole beneficiary of each self-settled trust. Moreover, under each trust agreement, "the trustees, *other than the defendant*, have the power to pay or apply so much of the net income of the trust or the principal of the trust fund to or for the use of the defendant as they *in their sole discretion* determine to be advisable for the health, education, comfort, support and maintenance of the defendant" and distributions "may only be made to the defendant with the unanimous written approval of (i) the Disinterested Trustee(s), (ii) each Family Trustee, if any; and (iii) each Current Adult Beneficiary, if any."[10] (Emphasis added.) The defendant, as the sole beneficiary of each trust, did have the right to appoint additional beneficiaries in the event of his death, including his "Current Spouse." At the time the trusts were created, however,

in Geneve Holdings, $97,229,993; 0.25 percent interest in The Ann Holdings, LLC, $16,282."

Elizabeth Ciccone testified that, with the "possible exception" of the Ann Holdings interest, she was "not aware of any other asset being transferred from [the defendant] individually into The Six Cataracts Trust." Ciccone "only [had] documentation that shows [that] [the Ann Holdings interest] is in there" but she did not "know how it came to be in there."

[10] The court noted that each of these terms was defined in the respective trust agreement and identified the defendant as the "Current Adult Beneficiary" of each trust. The court also expressly identified the defendant as the "Family Trustee" of The DASSA Trust, South Dakota Trust as the "Disinterested Trustee" of The DASSA and Ann Holdings Trusts, and South Dakota Trust as the "trustee" of The Scout Resources Trust.

despite the fact that the parties had been married since 2005, the plaintiff did not qualify as a "Current Spouse" as that term was defined in the respective trust agreements.[11] The court found that, as of the date of their respective valuations, The DASSA Trust, through its ownership of DASSA, LLC,[12] held assets with a total fair market value of $34,660,977, The Scout Resources Trust, through its ownership of Scout Resources, LLC,[13] held assets with a total fair market value of $2,727,548, and The Ann Holdings Trust, through its ownership of Ann Holdings, LLC, held a brokerage account[14] with a value of $7,589,211.

The court ultimately concluded that "[t]he trust assets [from each of the four trusts] are part of the marital estate." Applying Connecticut law and addressing

---

[11] The DASSA Trust Agreement and The Scout Resources Trust Agreement, which were both entered into in 2013, each define "Current Spouse" in relevant part as a "spouse that, as applicable, (i) has been married to [the defendant] . . . for no less than [twelve] years, (ii) has been generally living with [the defendant] at the time of his death . . . and (iii) shall not have been estranged from him . . . at the time of death." The Ann Holdings Trust Agreement, which was entered into in 2015, is identical except for the requirement that the current spouse has to have been married to the defendant "for no less than [fifteen] years."

[12] The defendant is the sole member of DASSA, LLC, a South Dakota limited liability company he formed on July 19, 2013. He transferred marital assets to DASSA, LLC, thereafter.

[13] The defendant is the sole member of Scout Resources, LLC, a Delaware limited liability company formed in 2011 and converted to a South Dakota limited liability company on October 30, 2013. Scout Resources, LLC, holds the former marital residence, the Round Hill Road property, as its primary asset.

[14] The defendant is the sole member of The Ann Holdings, LLC, which was initially formed on September 8, 2009, as The Ann, LLC, a Delaware limited liability company. After changing its name and converting to an Ohio limited liability company, The Ann Holdings, LLC, ultimately became a South Dakota limited liability company in 2015. The brokerage account held the remaining proceeds from the November, 2015 sale of a condominium apartment located in New York City. A limited liability company controlled by the defendant had purchased that property nineteen days after the parties were married in 2005.

the four trusts collectively,[15] the court reasoned that "[t]he defendant is the sole beneficiary of the three self-settled trusts that he secretly created with marital assets as the marriage deteriorated. He is the primary beneficiary of The Six Cataracts Trust. With respect to each of the trusts, he has the power to appoint additional trustees, to designate successor trustees, and to revoke the designation of any successor trustee. He also has the power to remove the current trustee up to three times in a ten year period—a power he exercised in 2013 in connection with The Six Cataracts Trust." The court further determined that "[n]o one other than the defendant has the power to control the trusts and direct the disposition of the trust assets" and proceeded to conclude "that the defendant has a presently existing property interest in the trusts and not a 'mere expectancy.' . . . The trust assets are properly included in the marital estate and subject to equitable distribution pursuant to . . . § 46b-81." (Citation omitted.)

The court also found that "[i]n the almost six years of litigation, the plaintiff has incurred attorney's fees and expert fees totaling approximately $3.5 million. Approximately $65,000 of those fees were incurred in prosecuting motions for contempt." (Footnote omitted.) It further found that "the attorney's fees charged to the plaintiff in this dissolution action are reasonable in view of the circumstances of this case . . . ." See footnote 5 of this opinion.

---

[15] The court had stated earlier in its decision that, "[a]lthough the court's construction of the trust agreements is governed by the law of the state of South Dakota, 'the ultimate question of whether the value of the entire trust corpus [is] properly attributable to the defendant's estate must be determined under the law of this state.' *Tremaine* v. *Tremaine*, 235 Conn. 45, 61 n.16, 663 A.2d 387 (1995)." We note, however, that the court did not cite to or apply South Dakota law in its decision. The extent to which the court construed the terms of the trust agreements prior to addressing the "ultimate question" as to whether the trust assets from the four trusts were part of the marital estate is therefore unclear.

In its orders, the court awarded sole legal custody and primary physical custody of the then minor children to the plaintiff and ordered the defendant to pay the plaintiff $15,000 per month in child support. The court further ordered the defendant to pay the plaintiff $40,000 per month as periodic alimony. Both of these awards were predicated, at least in part, on the court's finding that the defendant had an annual earning capacity of $2,500,000.

In awarding the plaintiff sole legal custody of the children, the court found the seventh factor of the seventeen factors listed in General Statutes § 46b-56 (c)[16] to be "particularly compelling." The court determined that "the plaintiff has consistently supported the relationship between the children and the defendant, including purchasing cards and gifts for him from the children," whereas the defendant "has done nothing to 'facilitate and encourage' the children's relationship with the plaintiff. He has made clear . . . that he believes that the plaintiff is not a capable parent, that she is mentally ill, suffers from anorexia, and lacks judgment, and that she engages in unusual conduct." The court expressly noted, however, that "[t]here is no support in the record for the defendant's allegations regarding the plaintiff. Neither Dr. [Arnold] Shienvold [the court appointed evaluator] nor the guardian ad litem share his views."

As part of its financial orders, the court ordered the defendant to "make a lump sum property distribution to the plaintiff in the total amount of $50,000,000," payable

---

[16] General Statutes § 46b-56 (c) provides in relevant part: "In making or modifying any order as provided in subsections (a) and (b) of this section, the court shall consider the best interests of the child, and in doing so, may consider, but shall not be limited to, one or more of the following factors . . . (7) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders . . . ."

from the four trusts as follows: "*(1) Payment from The Six Cataracts Trust*: The defendant shall pay the plaintiff $15,000,000 from The Six Cataracts Trust no later than February 23, 2023. Commencing on January 1, 2024, and continuing on January 1 every other year thereafter, the defendant shall pay $500,000 from The Six Cataracts Trust to the plaintiff until he has paid a total of $25,000,000 to the plaintiff from the trust. . . .

"*(2) Payment from The DASSA Trust, The Scout Resources Trust, and The Ann Holdings Trust:* The defendant shall pay the plaintiff $15,000,000 from the three self-settled trusts—The DASSA Trust, The Scout Resources Trust, and The Ann Holdings Trust—no later than February 23, 2023. Commencing on January 1, 2024, and continuing on January 1 every other year thereafter, the defendant shall pay $500,000 from the three self-settled trusts to the plaintiff until he has paid a total of $25,000,000 to the plaintiff from these trusts." (Emphasis in original.)

"Except for the lump sum property distribution to the plaintiff . . . the defendant shall retain his interest in The Six Cataracts Trust, The DASSA Trust, The Scout Resource[s] Trust, and The Ann Holdings Trust."

With respect to personal property, the court awarded the plaintiff "all personal property located in her apartment on Greenwich Avenue, her personal property located in the Round Hill Road property, and any other personal property that is otherwise in her possession" and reiterated its previous order of June 9, 2021; see footnote 1 of this opinion; that "the plaintiff shall have access to the Round Hill Road property between the hours of 9 a.m. and 5 p.m. for two days to remove her personal property from the Round Hill Road property." As part of its order, the court explained how the parties should arrive at the two dates and who could be present on those days.

Specifically, "[t]he plaintiff shall be accompanied by an off-duty Greenwich police officer when she is at the Round Hill Road property to remove her personal property. The Greenwich police officer shall remain at the Round Hill Road property at all times while the plaintiff is at the property. The plaintiff shall pay for the services of the Greenwich police officer. The plaintiff may be accompanied by up to two other individuals to assist her in removing her belongings, neither of whom shall be Barbara Netter. These individuals shall be permitted to enter the Round Hill Road property with the plaintiff.

"The defendant may be present while the plaintiff is at the Round Hill Road property. The children shall not be present under any circumstances." Moreover, "[t]he defendant shall not photograph, record, or monitor by security camera or other means of surveillance the plaintiff's removal of her personal property from the Round Hill Road property. The defendant shall not interfere with the plaintiff's access to the Round Hill Road property or to her personal property. The defendant shall not remove, move, or hide any of the plaintiff's personal property to prevent her from removing it from the Round Hill Road property."[17]

Finally, the court ordered that "[t]he defendant shall obtain, pay for, and maintain a term life insurance policy in the face amount of $5,000,000 for as long as the defendant has a court-ordered obligation to pay alimony, child support, and/or postsecondary educational expenses" for the parties' daughters, and it awarded

---

[17] "The court's order largely mirrored its pendente lite access order, except that it permitted the defendant to 'be present while the plaintiff is at the Round Hill Road property.' " *Netter* v. *Netter*, supra, 220 Conn. App. 498. "The pendente lite access order provided: 'If the defendant is at home while the plaintiff is retrieving her belongings from the Round Hill Road property, he must remain in the pool house and shall not be in the residence.' " Id., 498 n.6.

the plaintiff $3,300,000 in attorney's fees pursuant to General Statutes § 46b-62,[18] stating that "to order otherwise would undermine these financial orders."

The defendant filed a motion for reargument, a second motion for reargument and an amended motion for reargument, each of which the plaintiff opposed. The court denied the defendant's motions for reargument. The plaintiff filed a motion for clarification of the court's decision with respect to child support, which the court granted. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the court improperly determined that the assets held by the four trusts were part of the marital estate and subject to distribution pursuant to § 46b-81. He argues that each trust is a South Dakota spendthrift trust that is controlled by "South Dakota laws . . . which are very protective against the claims of creditors" and is not part of the marital estate because he does not have the authority to distribute, or compel the distribution of, funds therefrom.

The plaintiff disagrees. Although she posits that "a spendthrift trust is not considered an asset of the marital estate that the court may divide under . . . § 46b-81, because distributions to the beneficiary are at the trustee's sole discretion," she argues that the "three self-settled trusts . . . are not spendthrift trusts" and that, even though "The Six Cataracts Trust, is not a self-settled trust . . . it nevertheless carries almost all of the same provisions as the defendant's three self-settled trusts." The plaintiff does not argue, however,

---

[18] General Statutes § 46b-62 provides in relevant part: "(a) . . . [T]he court may order either spouse . . . to pay the reasonable attorney's fees of the other in accordance with their respective financial abilities and the criteria set forth in section 46b-82. . . ."

that The Six Cataracts Trust is not a spendthrift trust. Rather, she maintains that the defendant "retains significant legal authority over all four of the trusts, power sufficient for him to use a variety of procedures to access the trust assets . . . [such that] the trusts are not mere expectancies; they are part of the marital estate for purposes of § 46b-81." Alternatively, she argues that, "even if the trusts were cognizable, the trial court retained the power to enforce the compelling public policies that were controlling law in Connecticut when the three self-settled trusts were formed" by including them in the marital estate for distribution.

We agree with the defendant that The Six Cataracts Trust is a spendthrift trust that does not constitute marital property for purposes of § 46b-81. We also agree with the defendant that the three self-settled trusts are spendthrift trusts, but we agree with the plaintiff that, as *self-settled spendthrift trusts*, they violate the well established public policy of Connecticut that applies under the facts and circumstances of this case and, consequently, we conclude that the court properly determined that they are divisible marital property under § 46b-81.

We begin by setting forth our standard of review and the legal principles that are germane to our analysis. Our Supreme Court recently clarified the standard of review "that governs a trial court's determination that a particular asset or interest constitutes marital property for purposes of § 46b-81, which presents a mixed question of law and fact." *D. S.* v. *D. S.*, 351 Conn. 1, 9, 328 A.3d 111 (2025). To this end, "the standard of review of a trial court's determination whether an asset is classified as property is de novo.

"The trial court's underlying factual findings, however, are reviewable under a clearly erroneous standard and will be reversed only if they find no support in the

record or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . Lastly, the question of how these determinations as to any particular asset fit into the mosaic of all the trial court's financial orders is reviewable for abuse of discretion. . . .

"Section 46b-81 provides in relevant part: (a) At the time of entering a decree annulling or dissolving a marriage . . . the Superior Court may assign to either spouse all or any part of the estate of the other spouse.

\* \* \*

(c) In fixing the nature and value of the property, if any, to be assigned, the court, after considering all the evidence presented by each party, shall consider the length of the marriage, the causes for the annulment, dissolution of the marriage or legal separation, the age, health, station, occupation, amount and sources of income, earning capacity, vocational skills, education, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates.

"Our legislature has not defined the term property in § 46b-81, leaving courts to define it. In determining the equitable distribution of resources under the statute, courts should engage in a three step process, determining (1) whether the resource is property (classification), (2) what is the appropriate method for determining the value of the property (valuation), and, (3) what is the most equitable distribution of that property between the parties (distribution). . . .

"[Our Supreme Court] has articulated and refined a two part test by which trial courts may determine, on

a case-by-case basis, whether a potential interest constitutes divisible marital property under § 46b-81. In the first part of the . . . test, we ask whether the holder has a *presently* enforceable right [to receive the interest] . . . based on contractual principles or a statutory entitlement . . . . If the party has such a right, the interest is part of the marital estate and is distributable as property." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 10–12. The second part of the test "involves a more fact intensive analysis" that focuses "on the likelihood that the holder *eventually* will acquire an enforceable right in the interest, that is, whether the interest will likely vest or whether the holder will otherwise acquire a definitive right to it." (Emphasis in original.) Id., 12–13. In this case, the court determined that "the defendant has a presently existing property interest in the trusts and not a 'mere expectancy' " and that they were "properly included in the marital estate and subject to equitable distribution pursuant to . . . § 46b-81."

To assess the propriety of the trial court's determination in this regard, we must first set forth certain legal principles with regard to trusts. "A trust which creates a fund for the benefit of another, secures it against the beneficiary's own improvidence, and places it beyond the reach of his creditors is a spendthrift trust. *Zeoli* v. *Commissioner of Social Services*, 179 Conn. 83, 88, 425 A.2d 553 (1979); see also General Statutes § 52-321.[19] [A] spendthrift trust is one that restricts both the beneficiary's ability to alienate his interest in the fund

---

[19] "General Statutes § 52-321 (a) provides: 'If property has been given to trustees to pay over the income to any person, without provision for accumulation or express authorization to the trustees to withhold the income, and the income has not been expressly given for the support of the beneficiary or his family, the income shall be liable in equity to the claims of all creditors of the beneficiary.' " *Spencer* v. *Spencer*, 71 Conn. App. 475, 485 n.4, 802 A.2d 215 (2002).

and his creditor's ability to seize the property in satisfaction of his debts; in contrast to other types of protective trusts, a spendthrift trust in the technical sense exists where there is an express provision forbidding anticipatory alienations and attachments by creditors. 76 Am. Jur. 2d, [Trusts § 121 (1992)]. Where by statute or the trust terms it is provided that the interest of a beneficiary is not to be available to his creditors, and the court decisions in the state hold the provision valid without limit or qualification, obviously creditors have no rights or remedies as far as the trust property and the beneficiary's interest in it or the income thereof are concerned. They are limited to collection from sums after payment to the beneficiary, and to the products of such payments and to nontrust property. G. Bogert, Trusts & Trustees (2d Ed. Rev. 1992) § 227, p. 499.

"The well-settled rule in this state is that the exercise of discretion by the trustee of a spendthrift trust is subject to the court's control only to the extent that an abuse has occurred . . . . Furthermore, Connecticut bars creditors from reaching a distribution except, and until, it be in the hands of the beneficiary. . . . No title in the income passes to [the beneficiary] unless and until it is appropriated to him by the trustee, and then only to the amount determined by [the trustee]." (Citations omitted; footnote in original; internal quotation marks omitted.) *Spencer* v. *Spencer*, 71 Conn. App. 475, 484–86, 802 A.2d 215 (2002).

Our Supreme Court has stated, as a general proposition, that "a spendthrift trust . . . is not considered an asset of the marital estate that the court may divide under . . . § 46b-81." *Powell-Ferri* v. *Ferri*, 326 Conn. 457, 465, 165 A.3d 1124 (2017). If a spendthrift trust is *self-settled*, however, the Connecticut Qualified Dispositions in Trust Act (Connecticut act), General Statutes § 45a-487j et seq., governs its validity. Enacted in 2019; see Public Acts 2019, No. 19-137, § 99 through 108; the

Connecticut act sets the parameters for establishing a valid self-settled spendthrift trust, and authorizes the use of such trusts, in Connecticut. Prior to this legislation, self-settled spendthrift trusts violated the public policy of Connecticut and would not be allowed to shield a settlor's assets from his creditors. See *Greenwich Trust Co.* v. *Tyson*, 129 Conn. 211, 219–20, 27 A.2d 166 (1942).[20] "Moreover, Connecticut will not '. . . enforce the law of another jurisdiction nor the rights arising thereunder, which . . . contravene [Connecticut] public policy.' *Dick* v. *Dick*, 167 Conn. 210, 223–[24], 355 A.2d 110 (1974)." *In re Brooks*, 217 B.R. 98, 101 (Bankr. D. Conn. 1998).

Under the Connecticut act, however, a qualified disposition made by way of a written irrevocable trust

---

[20] In *Greenwich Trust Co.* v. *Tyson*, supra, 129 Conn. 211, our Supreme Court explained that "[t]he attempt of a man to place his property in trust for his own benefit under limitations similar to those which characterize a spendthrift trust is a departure from the underlying basis for the creation of such trusts. That aside, the public policy which sustains such trusts when created for the benefit of another is, where the settlor is himself the beneficiary, overborne by other considerations. In *Johnson* v. *Connecticut Bank*, 21 Conn. 148, [158 (1851)], where we were considering the right of the creditor of a beneficiary of a trust to secure satisfaction from the latter's right to the income, we stated: It is the policy of our law, that all the property of a debtor should be responsible for his debts. And his equitable estate may be taken, as well as his legal, provided it is subject to his [control]; and, subject to definite limitations, that has always been the policy of our law. . . . To admit the validity of such trusts would open too wide an opportunity for a man to evade his just debts to be permissible unless sanctioned by statutory enactment. This is the reason why the overwhelming weight of authority holds ineffective attempts to establish them. . . . But when a man settles his property upon a trust in his own favor, with a clause retaining his power of alienating the income, he undertakes to put his own property out of the reach of his creditors, while he retains the beneficial use of it. The practical operation of the transaction is, that he transfers a portion only of his interest, retaining in himself a beneficial interest, which he attempts by his own act to render inalienable by himself and exempt from liability for his debts. . . . If such trusts were sustained, the owner need only select as trustee a near kinsman or tried friend, on whom he may rely for liberality, and thus indirectly accomplish what he cannot do directly." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Greenwich Trust Co.* v. *Tyson*, supra, 219–20.

with at least one qualified trustee that specifies that Connecticut law applies to the trust's validity, construction and administration and mandates spendthrift provisions for the transferor or other beneficiaries may be considered valid. See General Statutes § 45a-487k (10). Moreover, the provisions of the Connecticut act may be applied retroactively to "all trusts created before, on or after January 1, 2020." General Statutes § 45a-487t (a) (1). If, however, "the court in which the judicial proceeding [concerning trusts commenced before January 1, 2020] is pending finds that application of a particular provision of [the Connecticut act] would substantially . . . prejudice the rights of the parties . . . [the Connecticut act will] not apply and the superseded law applies." General Statutes § 45a-487t (a) (3). Thus, if a self-settled spendthrift trust agreement does not satisfy the Connecticut act's requirements, or if a court finds that sustaining a self-settled spendthrift trust would substantially prejudice the rights of the parties, the law as it existed in Connecticut prior to the legislation is applicable; see General Statutes § 45a-487t (a) (3); and the trust will be void as a matter of public policy.

With these principles in mind, we must construe the terms of the respective trust instruments; see *Spencer* v. *Spencer*, supra, 71 Conn. App. 481–82; and determine whether the court properly considered the four trusts to be assets of the marital estate that it had the authority to divide under § 46b-81. "Because resolution of this issue turns on construing trust language and applying legal principles, it is subject to plenary review." (Internal quotation marks omitted.) *Marzaro* v. *Marzaro*, 231 Conn. App. 85, 98, 333 A.3d 134, cert. denied, 351 Conn. 925, 333 A.3d 795 (2025).

A

We turn first to The Six Cataracts Trust, formerly known as The Donald Netter Family Trust, which was

established by The Donald Netter Family Trust Agreement.[21] Ordinarily, we would begin by construing the terms of the trust agreement itself. See id.; *Spencer* v. *Spencer,* supra, 71 Conn. App. 481–82. As we have previously noted, however, The Donald Netter Family Trust Agreement is subject to a sealing order issued by the trial court and, thus, we are not at liberty to do so. See footnote 7 of this opinion.

We are guided, therefore, by the court's unchallenged findings that "The Six Cataracts Trust, formerly The Donald Netter Family Trust, was created by [the defendant's father] Edward Netter in 1992 for the benefit of the defendant and his descendants"; (footnote omitted); and that "[u]nder The Donald Netter Family Trust Agreement, the trustees, *other than the defendant,* have the power to pay or apply so much of the net income of the trust or the principal of the trust fund to or for the use of the defendant and his issue *as they in their sole discretion determine to be advisable for the comfort, support and maintenance of the defendant and his issue.*" (Emphasis added.) These findings support the conclusion the defendant advocates and the plaintiff does not dispute, namely, that The Six Cataracts Trust is a spendthrift trust. More specifically, these findings reflect that the settlor of The Donald Netter Family Trust, the defendant's father, Edward Netter, by expressly authorizing the income of the trust to be given for the support of the defendant beneficiary and his family, intended to create an irrevocable spendthrift

---

[21] We note that the court initially described each individual trust in four separate subsections of its decision. The court then addressed the trusts collectively in a fifth subsection entitled "*The trust assets are part of the marital estate*"; (emphasis in original); and articulated there its conclusion that "the defendant has a presently existing property interest in the trusts and not a 'mere expectancy.' " We have determined, however, that the fact that The Six Cataracts Trust is not self-settled, and The DASSA, Scout Resources and Ann Holdings Trusts are self-settled, is a dispositive distinction that warrants separate consideration and analysis.

trust that could not be reached by the defendant's creditors.[22] See *Spencer* v. *Spencer*, supra, 71 Conn. App. 484–85; see also General Statutes § 52-321. "Because the plaintiff obtained a judgment against the defendant [in this dissolution action], her status is that of a creditor. . . . Thus, the plaintiff can reach neither the income nor the principal [of The Six Cataracts Trust] until it is distributed and in the hands of the defendant." (Citations omitted; footnote omitted.) *Spencer* v. *Spencer*, supra, 486; see also, e.g., *Cooley* v. *Cooley*, 32 Conn. App. 152, 169, 628 A.2d 608 (judgment in dissolution action established plaintiff's status as creditor), cert. denied, 228 Conn. 901, 634 A.2d 295 (1993).

Although the defendant argued in his corrected posttrial brief that "The [Six Cataracts Trust] has significant spendthrift provisions, subject to a paid Disinterested Trustee with sole authority to withhold beneficiary distributions" and that "[a]s an *expectancy*, The Six Cataracts Trust is not a marital asset"; (emphasis in original); the court, apart from recognizing that The Six Cataracts Trust is not a self-settled trust, did not address the nature of the trust or the settlor's intent. Instead, the court focused on the defendant's roles and actions as investment trust advisor and sole manager of SDAS, LLC, and found that "[n]o one other than the defendant has the power to control [The Six Cataracts Trust] and

---

[22] The defendant argues that, although Connecticut law governs the ultimate question as to whether the trust assets are part of the marital estate, South Dakota law, which is "very protective against the claims of creditors," should govern the construction of the trust agreement. The court appeared to agree. See footnote 15 of this opinion. We cannot ascertain, given the restricted record, whether this is accurate. See footnote 7 of this opinion. Even so, we note that in South Dakota, as in Connecticut, "[w]hen interpreting a trust instrument, [the court] must ensure that the intentions and wishes of the [settlor] are honored." (Internal quotation marks omitted.) *Plains Commerce Bank, Inc.* v. *Beck*, 986 N.W.2d 519, 528 (S.D. 2023); see also *Spinnato* v. *Boyd*, 231 Conn. App. 460, 472, 333 A.3d 818 (2025) ("[t]he cardinal rule of construction of all trusts . . . is to find and effectuate the intent of the testator or settlor" (internal quotation marks omitted)).

direct the disposition of the trust assets." The court then relied on this finding to conclude that "the defendant has a presently existing property interest in [The Six Cataracts Trust] and not a 'mere expectancy.' "

The court's unchallenged finding, however, that The Donald Netter Family Trust Agreement establishes that "*the trustees, other than the defendant*, have the power to pay or apply so much of the net income of the trust or the principal of the trust fund to or for the use of the defendant and his issue as they *in their sole discretion* determine to be advisable for the comfort, support and maintenance of the defendant and his issue"; (emphasis added); belies its conclusion, as does the testimony of Elizabeth Ciccone, whose testimony the court credited "over twelve days of trial," that all trust "distributions have to be approved by the disinterested trustee," South Dakota Trust. As such, the finding on which the court based its conclusion that The Six Cataracts Trust is part of the marital estate is a clearly erroneous finding that is not supported by, and in fact contradicts, the record, and it cannot stand. See *D. S.* v. *D. S.*, supra, 351 Conn. 10.

The Six Cataracts Trust, which the defendant's father established nearly thirteen years prior to the parties' marriage, is a spendthrift trust that provides a fund for the benefit of the defendant and his descendants. As a spendthrift trust, it expressly affords the trustees *other than the defendant* the sole discretion as to whether and when to distribute funds and places those funds beyond the reach of his creditors, including the plaintiff.[23] See *Zeoli* v. *Commissioner of Social Services*,

---

[23] Although we note that Ciccone testified at trial that the trust resolution; see footnote 8 of this opinion; "create[d] the role of the current adult beneficiary which gives that person the power to approve or veto distributions" and that the defendant assumed that role, the trust resolution itself, which was entered into evidence at trial, reflects no such thing. Regardless, as we have stated previously, Ciccone also testified that all trust distributions must be approved by the disinterested trustee, South Dakota Trust.

supra, 179 Conn. 88. The defendant has no presently enforceable right to receive the interest in the trust and the court should not have considered it an asset of the marital estate that it was authorized to divide under § 46b-81. See *Powell-Ferri* v. *Ferri*, supra, 326 Conn. 465.

B

We now turn to the "three self-settled trusts that [the defendant] secretly created with marital assets as the marriage deteriorated." The DASSA Trust Agreement, The Scout Resources Trust Agreement and The Ann Holdings Trust Agreement each specify that "[t]he validity, construction and administration of this Trust shall be governed and construed by the laws of the State of South Dakota, and the courts thereof shall have exclusive jurisdiction to adjudicate all claims, actions or proceedings relating to this Trust Agreement."[24] As such, we agree with the defendant that South Dakota law governs our interpretation of these trust agreements. We emphasize, however, that, although our construction of the three self-settled trust agreements is governed by South Dakota law, the ultimate question of whether they constitute property that is properly attributable to the marital estate must be determined by applying Connecticut law.[25] See *Tremaine* v. *Tremaine*, 235 Conn. 45, 61 n.16, 663 A.2d 387 (1995).

Under South Dakota law, "[t]he interpretation of a trust instrument is a question of law reviewed de novo. . . . When interpreting a trust instrument, [the court]

---

[24] We note that, unlike The Donald Netter Family Trust Agreement, the three self-settled trust agreements were not subject to sealing orders at trial.

[25] In his principal brief to this court, the defendant expressly recognizes the interpretation of the trust agreements under South Dakota law as "a predicate [to] determining whether the trusts are includable in the marital estate subject to equitable distribution as a marital asset pursuant to Connecticut law."

must ensure that the intentions and wishes of the [settlor] are honored. . . . To do so, [the court] first look[s] to the language of the trust instrument" and, "[i]f the language of the trust instrument makes the intention of the [settlor] clear, it is [the court's] duty to declare and enforce it." (Citations omitted; internal quotation marks omitted.) *Plains Commerce Bank, Inc.* v. *Beck*, 986 N.W.2d 519, 527–28 (S.D. 2023).

The defendant created The DASSA Trust on September 19, 2013, The Scout Resources Trust on December 14, 2013, and The Ann Holdings Trust on June 2, 2015. The defendant is the sole beneficiary of each irrevocable trust and he is also the Investment Trust Advisor. South Dakota Trust is the Disinterested Trustee of each trust. Although the defendant had the authority to appoint additional beneficiaries in the event of his death, including his "Current Spouse," and, although the defendant created the trusts more than eight years into the marriage, the plaintiff did not qualify as a "Current Spouse" as that term was defined in the trust agreements.

As the court found, "[u]nder [each] trust agreement, the trustees, *other than the defendant*, have the power to pay or apply so much of the net income of the trust or the principal of the trust fund to or for the use of the defendant as they in their sole discretion determine to be advisable for the health, education, comfort, support, and maintenance of the defendant. [Each] trust agreement provides that distributions may only be made to the defendant with the unanimous written approval of (i) the Disinterested Trustee(s), (ii) each Family Trustee, if any; and (iii) each Current Adult Beneficiary, if any." (Emphasis added.)

In addition, each trust agreement includes a "Restrictions on Alienation" clause that states, in relevant part, that "[n]either the [n]et [i]ncome nor the principal of

any trust hereunder shall be alienable by any current [b]eneficiary, either by anticipation, assignment or any other method and the same shall not be subject to be taken by his or her creditors (other than the Trustees) by any process whatsoever . . . ." Finally, each trust agreement expressly states that "[t]his Trust is intended to be a South Dakota 'Qualified Disposition Trust' and all transfers made to the Trust are intended to be 'qualified dispositions' pursuant to Chapter 55-16 of South Dakota Codified laws,[26] now and as hereafter amended from time to time and all provisions of this Trust shall be interpreted, construed and administered pursuant to this intention." (Footnote added.)

The plain and unambiguous terms of these trust agreements establish that the defendant intended to create three South Dakota self-settled spendthrift trusts. At the time the defendant established them, however, self-settled spendthrift trusts violated Connecticut public policy as a matter of course and would not be sustained. See *Greenwich Trust Co.* v. *Tyson*, supra, 129 Conn. 219–20; *In re Brooks*, supra, 217 B.R. 101. Moreover, although the Connecticut act sets parameters for establishing valid self-settled trusts, authorizes their use in Connecticut, and provides that its provisions may be applied retroactively to "all trusts created before, on or after January 1, 2020"; General Statutes § 45a-487t (a) (1); the Connecticut act nonetheless affords courts the discretion to apply the law it superseded if the "application of a particular provision of [the Connecticut act] would substantially . . . prejudice the rights of the parties. . . ." General Statutes § 45a-487t (a) (3).

---

[26] South Dakota's Qualified Dispositions in Trust Act has authorized the use of self-settled spendthrift trusts in South Dakota since its enactment in 2005. See S.D. Codified Laws §§ 55-16-1 to 55-16-16 (2025); M. Krogstad & M. Van Heuvelen, "Domestic Asset Protection Trusts: Examining the Effectiveness of South Dakota Asset Protection Trust Statutes for Removing Assets from a Settlor's Gross Estate," 61 S.D. L. Rev. 378, 378–79 (2016).

In the present case, the court ultimately concluded that the three self-settled spendthrift trusts were assets of the marital estate after finding that "[n]o one other than the defendant has the power to control the trusts and direct the disposition of the trust assets" and that the defendant had a presently existing property interest in them. As with The Six Cataracts Trust, however, the disinterested trustee, South Dakota Trust, must approve any and all distributions from the trusts, and, thus, the court's finding that the defendant has exclusive control over the three self-settled trusts and the distributions therefrom cannot be sustained. See *D. S.* v. *D. S.*, supra, 351 Conn. 10. Nevertheless, on the basis of our plenary review of the record, we conclude that the court's ultimate determination that the three self-settled spendthrift trusts constitute divisible marital property withstands scrutiny. See id.

At the outset, we note that the respective trust agreements do not satisfy the requirements set forth in § 45a-487k (10) because each agreement provides that the laws of South Dakota, not Connecticut, govern their validity, construction and administration. As such, they are not valid trust instruments within the context of the Connecticut act.

Moreover, even if they were, the defendant established each self-settled South Dakota trust during the marriage and well before January 1, 2020, at a time when Connecticut did not recognize the validity of self-settled trusts. The court found that the defendant did so "secretly . . . with marital assets as the marriage deteriorated." In fact, the court emphasized this finding throughout its decision by stating three times that the defendant had formed each self-settled trust "during the marriage with marital assets and without the plaintiff's knowledge." The court also made it clear that the defendant had actually used "most of the marital assets" in doing so. The court further explained that "[t]he

defendant constantly accused the plaintiff of being after his money. He left her notes with a large '0' on them. He would wake her up while she was sleeping and whisper in her ear, 'How much do you want?' He told her that she would get nothing."[27]

Our review of the trial court's decision, and these unchallenged findings in particular, reveals that the trial court was particularly concerned about the defendant's duplicitous efforts to place most of the marital assets beyond the plaintiff's reach by putting them in the three self-settled South Dakota spendthrift trusts he created when he knew the marriage was in trouble and that a divorce was imminent. See *Wheelabrator Bridgeport, L.P.* v. *Bridgeport*, 320 Conn. 332, 355, 133 A.3d 402 (2016) (interpretation of trial court judgment is question of law). This concern is well founded, and it guides our analysis.

It is well settled in Connecticut that "a trial court may consider evidence that a spouse dissipated marital assets prior to the couple's physical separation, for purposes of determining an equitable distribution of property under § 46b-81, so long as the actions constituting dissipation occur either: (1) in contemplation of divorce or separation; or (2) while the marriage is in serious jeopardy or is undergoing an irretrievable breakdown. . . . [D]issipation in the marital dissolution context requires financial misconduct involving marital assets, such as intentional waste or a selfish financial impropriety, coupled with a purpose unrelated to the marriage." (Citation omitted; internal quotation marks omitted.) *Finan* v. *Finan*, 287 Conn. 491, 499, 949 A.2d 468 (2008); see also id., 500 n.6 ("dissipation is [t]he use of an asset

---

[27] The defendant does not challenge these factual findings as part of this appeal. See *JPMorgan Chase Bank, National Assn.* v. *Essaghof*, 221 Conn. App. 475, 485, 302 A.3d 339 ("claims of error not briefed are considered abandoned" (internal quotation marks omitted)), cert. denied, 348 Conn. 923, 304 A.3d 445 (2023).

for an illegal or inequitable purpose, such as a spouse's use of community property for personal benefit when a divorce is imminent" (internal quotation marks omitted)).

Although the court based its ultimate conclusion that the three self-settled trusts were part of the marital estate on its determination that the defendant controlled them and had a presently existing property interest in them, the court also plainly considered the defendant's preseparation dissipation of marital assets when fashioning its orders and rendering its decision. In our view, this dissipation supports the conclusion that even if the trusts satisfied the requirements of the Connecticut act, which they do not, they would nonetheless be void as a matter of public policy by virtue of the fact that sustaining them and excluding their assets from distribution would unfairly prejudice the plaintiff. See General Statutes § 45a-487t (a) (3). For these reasons, we conclude that the court properly determined that the three self-settled trusts constitute divisible marital property. See *Dorfman* v. *Liberty Mutual Fire Ins. Co.*, 227 Conn. App. 347, 425, 322 A.3d 331 (2024) ("[i]t is axiomatic that [an appellate court] may affirm a proper result of the trial court for a different reason" (internal quotation marks omitted)), cert. denied, 351 Conn. 907, 330 A.3d 881 (2025), and cert. denied, 351 Conn. 907, 330 A.3d 882 (2025).

C

In light of our conclusion that the trial court improperly treated the assets from The Six Cataracts Trust as marital property and ordered that distributions therefrom should be used to satisfy one half of the $50,000,000 lump sum property distribution payment it ordered the defendant to make to the plaintiff with funds from all of the trusts, we turn to the question of the appropriate relief. "Individual financial orders in a

dissolution action are part of the carefully crafted mosaic that comprises the entire asset reallocation plan. . . . Under the mosaic doctrine, financial orders should not be viewed as a collection of single disconnected occurrences, but rather as a seamless collection of interdependent elements. Consistent with that approach, our courts have utilized the mosaic doctrine as a remedial device that allows reviewing courts to remand cases for reconsideration of all financial orders even though the review process might reveal a flaw only in the alimony, property distribution or child support awards. . . .

"Every improper order, however, does not necessarily merit a reconsideration of all of the trial court's financial orders. A financial order is severable when it is not in any way interdependent with other orders and is not improperly based on a factor that is linked to other factors. . . . In other words, an order is severable if its impropriety does not place the correctness of the other orders in question. . . . Determining whether an order is severable from the other financial orders in a dissolution case is a highly fact bound inquiry." (Internal quotation marks omitted.) *Wald* v. *Cortland-Wald*, 226 Conn. App. 752, 775, 319 A.3d 769 (2024).

In the present case, the court found that the "defendant controls assets worth in excess of $175,000,000," and it fashioned its financial orders accordingly. Those assets included the fair market value of the assets held by the trusts which, collectively, was $173,551,753. The assets of The Six Cataracts Trust comprised $122,678,483 of that amount. We have concluded in part I A of this opinion, however, that The Six Cataracts Trust is a valid spendthrift trust and that the defendant has no presently enforceable right to receive the interest it holds. In other words, the defendant does not control $122,678,483 of the $175,000,000 that formed the basis for the financial orders in this case.

"In dissolution proceedings, the court must fashion its financial orders in accordance with the criteria set forth in . . . § 46b-81 (division of marital property), [General Statutes] § 46b-82 (alimony) and [General Statutes §] 46b-84 (child support). All three statutory provisions require consideration of the parties' *amount and sources of income* in determining the appropriate division of property and size of any child support or alimony award." (Emphasis in original; internal quotation marks omitted.) *Valentine* v. *Valentine*, 149 Conn. App. 799, 802–803, 90 A.3d 300 (2014). Because it is uncertain whether the court's other financial orders will remain intact after reconsidering the property distribution orders in a manner consistent with this opinion, we conclude that the entirety of the mosaic must be refashioned. See *Renstrup* v. *Renstrup*, 217 Conn. App. 252, 285, 287 A.3d 1095, cert. denied, 346 Conn. 915, 290 A.3d 374 (2023). Accordingly, the court must consider all the financial orders on remand, including the alimony, child support[28] and attorney's fees awards, but excluding the personal property distribution order for the reasons set forth in part III of this opinion.

## II

We next address the defendant's claim that the court abused its discretion by awarding the plaintiff sole physical and legal custody of the parties' two then minor children. Specifically, the defendant argues that the court "incorrectly assigned unilateral fault to the [defendant] and ignored [the plaintiff's] parental deficiencies by awarding sole legal custody of the minor children to the [plaintiff] . . . ."[29] We disagree.

---

[28] We note, in this regard, that, on remand, child support is to be determined for both children, as both were minors at the time of the judgment and thus both subject to the child support order the court issued at that time.

[29] In making this claim, the defendant references, without citation, "the memorandum of decision finding that [he] was a loving, attentive, responsible and respectful parent capable of arriving at joint child related decisions with the [plaintiff] and capable of performing effective crisis management." Our review of the court's memorandum of decision reveals no such finding

We begin by noting that, although both children were minors at the time of judgment in this case, the parties' older daughter has since reached the age of majority. The propriety of the court's order as it pertains to her, therefore, is not at issue on appeal. See, e.g., *A. A.-M.* v. *M. Z.*, 225 Conn. App. 46, 54, 313 A.3d 1288 (2024) (appeal challenging custody orders and access to child was rendered moot when child attained age of eighteen); *Nowacki* v. *Nowacki*, 144 Conn. App. 503, 508–509, 72 A.3d 1245 (noting that orders with respect to parties' older child were not at issue on appeal because he reached age of majority while appeal was pending), cert. denied, 310 Conn. 939, 79 A.3d 891 (2013).

We now set forth the legal principles regarding a trial court's custody determination. "Orders regarding the custody and care of minor children . . . are governed by . . . § 46b-56, which grants the court broad discretion in crafting such orders. . . . [Section] 46b-56 (a) provides in relevant part: In any controversy before the Superior Court as to the custody or care of minor children . . . the court may make . . . any proper order regarding the custody, care, education, visitation and support of the children if it has jurisdiction . . . . Subject to the provisions of section 46b-56a, the court may assign parental responsibility for raising the child to the parents jointly, or may award custody to either parent or to a third party, according to its best judgment upon the facts of the case and subject to such conditions and limitations as it deems equitable. . . . (b) In making . . . any order as provided in subsection (a) of this section, the rights and responsibilities of both parents shall be considered and the court shall enter orders accordingly that serve the best interests of the child and provide the child with the active and consistent

---

or any language that can reasonably be construed to support such a finding. See *Wheelabrator Bridgeport, L.P.* v. *Bridgeport*, supra, 320 Conn. 355 (interpretation of trial court judgment is question of law).

involvement of both parents commensurate with their abilities and interests. Such orders may include . . . (3) the award of sole custody to one parent with appropriate parenting time for the noncustodial parent where sole custody is in the best interests of the child . . . . [Section] 46b-56 (c) directs the court, when making any order regarding the custody, care, education, visitation and support of children, to consider the best interests of the child, and in doing so [the court] may consider, but shall not be limited to, one or more of [seventeen enumerated] factors. . . . The court is not required to assign any weight to any of the factors that it considers. . . .

"In reaching a decision as to what is in the best interests of a child, the court is vested with broad discretion and its ruling will be reversed only upon a showing that some legal principle or right has been violated or that the discretion has been abused. . . . As our Supreme Court recently reiterated, [t]he authority to exercise the judicial discretion [authorized by § 46b-56] . . . is not conferred [on] [the state's appellate courts], but [on] the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court." (Citations omitted; footnote omitted; internal quotation marks omitted.) *N. R.* v. *M. P.*, 227 Conn. App. 698, 714–16, 323 A.3d 1142 (2024); see also *F. S.* v. *J. S.*, 223 Conn. App. 763, 787–88, 310 A.3d 961 ("[i]t is a rare case in which a disappointed litigant will be able to demonstrate abuse of a trial court's broad discretion in [child custody] matters" (internal quotation marks omitted)), cert. denied, 350 Conn. 903, 323 A.3d 344 (2024).

The primary basis of the defendant's claim on appeal is that "[t]here was incontrovertible evidence that the [plaintiff] was untruthful in her trial testimony and that she behaved inappropriately with one or both of the

minor children at times" and that "[t]here were no similar allegations leveled against [the defendant], yet the court awarded sole legal custody to the [plaintiff]." The court, however, expressly credited the plaintiff's testimony and the six main reasons she gave for the breakdown of the marriage, which were "the defendant's paranoia and suspicious behavior; his controlling and abusive conduct; his sexually coercive behavior; his inability to get along with others; his conviction that [the plaintiff] was anorexic; and his gaslighting [the plaintiff] and telling her she was crazy." See *Kohl's Dept. Stores, Inc.* v. *Rocky Hill*, 219 Conn. App. 464, 485, 295 A.3d 470 (2023) ("It is axiomatic that, [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses." (Internal quotation marks omitted.)).

In addition, the court found the seventh factor of the seventeen factors listed in § 46b-56 (c) to be "particularly compelling." As previously noted, this factor concerns "the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders . . . ." General Statutes § 46b-56 (c) (7). The court determined that "the plaintiff has consistently supported the relationship between the children and the defendant, including purchasing cards and gifts for him from the children," whereas the defendant "has done nothing to 'facilitate and encourage' the children's relationship with the plaintiff. He has made clear . . . that he believes that the plaintiff is not a capable parent, that she is mentally ill, suffers from anorexia, and lacks judgment, and that she engages in unusual conduct." The court expressly found, however, that there was "no support in the record for the defendant's allegations

regarding the plaintiff." Moreover, the court found that the issue of the defendant's " 'compliance with any court orders' " warranted a separate discussion and detailed that he had "repeatedly failed" in this regard. The defendant has not challenged these findings on appeal. See *JPMorgan Chase Bank, National Assn.* v. *Essaghof,* 221 Conn. App. 475, 485, 302 A.3d 339, cert. denied, 348 Conn. 923, 304 A.3d 445 (2023).

The court also found that the first, second and third factors of § 46b-56 (c)[30] were relevant. "While the plaintiff demonstrated throughout this litigation that she has the capacity and disposition to understand and meet the temperament and developmental needs of the children and to protect their physical and emotional safety, the defendant regularly disregarded their interests by failing to respond to the plaintiff on a timely basis regarding dates for medical and orthodontic appointments, even appointments that were time sensitive." The defendant also has not challenged these findings on appeal. See *JPMorgan Chase Bank, National Assn.* v. *Essaghof,* supra, 221 Conn. App. 485.

Finally, the court considered the testimony of the guardian ad litem, who "testified that the defendant suffered from 'paralysis by analysis,' " in that the defendant would "analyze something to the point where we don't get a decision, or we get a decision that is so greatly delayed that it adversely impacts the [children],"[31] and expressed concerns about the "defendant's ability to be actively involved in the children's

---

[30] The first three factors listed in § 46b-56 (c) concern "(1) [t]he physical and emotional safety of the child; (2) the temperament and developmental needs of the child; [and] (3) the capacity and the disposition of the parents to understand and meet the needs of the child . . . ."

[31] The court explained that the guardian ad litem "described the yearlong delay in obtaining essential medical treatment for [the parties' elder daughter] that was caused by the defendant." To this end, "[t]he plaintiff testified that the defendant would become overly involved in the children's health matters. She said they would see one specialist, then the defendant would not like that specialist and demand a second opinion. After the defendant

lives . . . ." Moreover, the guardian ad litem recommended that the court award sole legal custody of the children to the plaintiff.

These findings by the court, which are either unchallenged or based on its credibility determinations, and which are consistent with the testimony and recommendations of the guardian ad litem; see *N. R.* v. *M. P.*, supra, 227 Conn. App. 729–30; support the award of sole legal custody to the plaintiff. "The defendant essentially requests that we reweigh the evidence in his favor. [W]e do not retry the facts or evaluate the credibility of witnesses. . . . Accordingly, we are not persuaded that the court abused its discretion in its custody orders." (Citation omitted; internal quotation marks omitted.) *Pencheva-Hasse* v. *Hasse*, 221 Conn. App. 113, 128–29, 300 A.3d 1175 (2023).

## III

The defendant next claims that the court's order that the plaintiff shall be afforded access to the former marital home to retrieve her personal property therefrom is "overly broad" and that it "must either be vacated or constrained to be specifically limited to the kitchen, [the plaintiff's] desk area, and her personal closet."[32] He argues that the order constitutes a "warrant" that

became involved, he would insist on finding a specialist that he liked. According to the plaintiff, it was absolutely the defendant's way or the highway."

[32] We note that the defendant does not challenge the substantive propriety of the court's personal property distribution order itself. Rather, his claim pertains solely to the parameters the court put in place for the plaintiff to access the former marital home in order to retrieve her personal belongings. Thus, the defendant has abandoned any challenge to the substance of the personal property distribution order; see *JPMorgan Chase Bank, National Assn.* v. *Essaghof*, supra, 221 Conn. App. 485; and the court's exercise of its discretion in distributing personal property to the plaintiff as part of its financial orders is not at issue on appeal. See *Casey* v. *Casey*, 82 Conn. App. 378, 389, 844 A.2d 250 (2004) (personal property distribution orders are part of financial orders).

fails to "describe with particularity the places within the residence to be searched and the items the [plaintiff] may take" and thus violates his rights under the fourth amendment to the United States constitution and article first, § 7, of the Connecticut constitution. We disagree.

Although the defendant clothes his claim in constitutional garb, "[p]utting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender." (Internal quotation marks omitted.) *Rosenfeld* v. *Rosenfeld*, 115 Conn. App. 570, 579, 974 A.2d 40 (2009). Our plenary review of the court's order reveals nothing more than a personal property distribution order that establishes the parameters by which the plaintiff is to remove her personal property from the former marital residence. See *Wheelabrator Bridgeport, L.P.* v. *Bridgeport*, supra, 320 Conn. 355. As such, we review the defendant's claim under an abuse of discretion standard.[33] See *D. S.* v. *D. S.*, supra, 351 Conn. 10.

"[U]nder Connecticut law, courts are empowered to deal broadly with property and its equitable division incident to dissolution proceedings." (Internal quotation marks omitted.) *Powers* v. *Hiranandani*, 197 Conn. App. 384, 409, 232 A.3d 116 (2020). "As our Supreme Court has repeatedly stated, judicial review of a trial court's exercise of its broad discretion in domestic relations cases is limited to the questions of whether the [trial] court correctly applied the law and could reasonably have concluded as it did. . . . Moreover, the power to act equitably is the keystone to the court's ability to fashion relief in the infinite variety of circumstances which arise out of the dissolution of a

---

[33] We note, nonetheless, that, although the defendant cites article first, § 7, of the constitution of Connecticut in his brief, he has not included a separate state constitutional analysis. Therefore, any separate state constitutional claim would be abandoned. See *State* v. *Lueders*, 225 Conn. App. 612, 634 n.21, 317 A.3d 69, cert. denied, 349 Conn. 920, 321 A.3d 402 (2024).

marriage." (Internal quotation marks omitted.) *Fitzsimons* v. *Fitzsimons*, 116 Conn. App. 449, 458–59, 975 A.2d 729 (2009); see also *Powers* v. *Hiranandani*, supra, 400. "In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action." (Internal quotation marks omitted.) *Maturo* v. *Maturo*, 296 Conn. 80, 88, 995 A.2d 1 (2010).

The defendant claims that the court's personal property distribution order is overly broad because it "does not describe or constrain the areas within the residence" the plaintiff can access and thus allows her to "enter any portion of the residence [she] want[s]." He argues that "[t]he evidence before the . . . court was that the items [the plaintiff] seeks to retrieve are located in the residence's kitchen, in, on or around her desk and in whatever closet her clothes were in when she left" and that the scope of the order should have been limited to those areas. He further maintains that the order "fails to particularly describe the items" that constitute the plaintiff's personal property.

In its decision, however, the court credited the plaintiff's testimony "that the defendant gaslighted her by, for example, moving items in the kitchen from where she had left them, taking her jewelry out of its boxes, putting a tricycle on her desk, and leaving odd notes for her around the house. Even after this action was commenced, the defendant deposited the plaintiff's alimony payment in her UBS account rather than in her First Republic account without telling her. He directed the guardian ad litem not to mention it, even though the plaintiff thought that her alimony payment had not been made." Also, the court noted, the case had been pending for "almost six years" by the time the court ultimately rendered its decision. As such, even if it is

true that the locus of all of the plaintiff's personal property had at one time been confined to the areas the defendant describes in his brief, it would not have been reasonable, given his noted proclivities and the passage of time, to conclude that those would be the only areas in the residence where the plaintiff's property currently exists. In fact, the evidence presented in this case suggests that the opposite is true, and the court's order necessarily accounts for this by specifying that "[t]he defendant shall not interfere with the plaintiff's access to the Round Hill Road property or to her personal property. The defendant shall not remove, move, or hide any of the plaintiff's personal property to prevent her from removing it from the Round Hill Road property."

With respect to specificity, the court awarded the plaintiff all her "personal property located in her apartment on Greenwich Avenue, her personal property located in the Round Hill Road property, and any other personal property that is otherwise in her possession." This included the plaintiff's "own clothing, jewelry, and personal items such as books and memorabilia" as well as the family photographs. These orders are sufficiently clear and explicit, and they are appropriately tailored to the facts and circumstances of this case.

We also note that the court properly balanced its order by setting limits as to the time of access and allowing the defendant to select the two dates he preferred from a list of six. Moreover, the plaintiff must pay for the off-duty Greenwich police officer to be there and the defendant's mother, Barbara Netter, with whom the defendant has a strained relationship, cannot accompany the plaintiff to assist with the removal of her belongings. Finally, whereas the court had relegated the defendant to the pool house in its nearly identical pendente lite access order; see footnote 17 of this opinion; in its final order, it permitted the defendant to be

present, inside the residence, when the plaintiff collects her property. We are not persuaded that the court abused its discretion with respect to the parameters of its order that the plaintiff have access to the former marital residence to retrieve her personal belongings.

The judgment is reversed only as to the financial orders and the case is remanded for a new trial on all financial issues consistent with this opinion; the appeal is dismissed as to the custody order insofar as it pertains to the parties' older child; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.